



FILED by _____ D.C.

AUG 17 2015

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

Page 2

15-CV-14301-Martinez/White

**PETITION UNDER 28 U.S.C. §2254 FOR WRIT OF**
**HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| **United States District Court** | District: **Southern District of Florida** | |
|---|---|---|
| Name (under which you were convicted): **ROGER KHAN** | | Docket or Case No.: |
| Place of Confinement: **Martin Correctional Institute 1150 S.W. Allapattah Road Indiantown, Florida 34956** | | Prisoner No: **K62116** |
| Petitioner (include the name under which you were convicted) **ROGER KHAN** Petitioner. | Respondent (authorized person having custody of petitioner) **JULIE L. JONES,** **Secretary, Florida Dept Of Corrections.** | |

V.

v.

The Attorney General of the State of Florida, **Pamela Jo Bondi**

## PETITION

1.  (a)   Name and location of court that entered the judgment of conviction you are challenging:
    **The 19th Judicial Circuit, in and for St. Lucie County, Florida, P.O. Box 700 Ft. Pierce, FL 34954.**
    (b)   Criminal docket or case number (if you know): **522002-CF-1166A**
2.  (a)   Date of the judgment of conviction (if you know): **April 29, 2003**
    (b)   Date of Sentencing: **April 29, 2003**
3.  Length of Sentence: **Forty (40) years.**
4.  In this case, were you convicted on more than one count or of more than one crime?   Yes ☒   ☐
5.  Identify all crimes of which you were convicted and sentenced in this case:
    **Count One, Sexual battery; Count Two, Incest; Count Three, Child Abuse – Impregnating Minor.**
6.  (a) What was your plea? (Check one)
    (1)   Not Guilty ☒        (3)   Nolo contendere (no contest) ☐
    (2)   Guilty ☐        (4)   Insanity plea ☐
    (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge,
        what did you plead guilty to and what did you plead not guilty to?  **N/A**
    (c) If you went to trial, what kind of trial did you have? (Check one)
        Jury ☒      Judge only ☐
7.  Did you testify at a pretrial hearing, trial, or a post-trial hearing?
        Yes ☐      No ☒
8.  Did you appeal from the judgment of the conviction?
        Yes ☒      No ☐
9.  If you did appeal, answer the following:
    (a)   Name of court:  **The Fourth District Court of Appeal**
    (b)   Docket or case number (if you know): **4D03-1839**
    (c)   Result:  **per curiam affirmed**
    (d)   Date of result (if you know): **November 30, 2004**
    (e)   Citation to the case (if you know): ***Khan v. State***, **884 So.2d 946 (Fla. 4th DCA 2004).**
    (f)   Grounds raised:

**cat / div** 2254 / 530 / Ft. Pierce,
**Case #** _____
**Judge** _____ Mag **Daw**
**Motn Ifp** **N/O** ____ **Fee pd $** **N/O**
**Receipt #** _____

2

**Ground One**
The trial court erroneously denied the Defendant's motion for mistrial as a state witness improperly testified concerning statements of the purported victim that were not pertinent to diagnosis or treatment of the victim's medical condition.

**Ground Two**
The state improperly introduced irrelevant and inflammatory evidence of collateral bad acts of the Defendant.

**Ground Three**
The trial court erroneously denied the Defendant's motion for mistrial challenging the State's reference to hearsay statement of the purported victim during its opening statement.

(g)    Did you seek further review by a higher state court?   Yes ☐       No ☒
        If yes, answer the following:
        (1)    Name of the court: **N/A**
        (2)    Docket number or case number (if you know): **N/A**
        (3)    Result: **N/A**
        (4)    Date of result (if you know): **N/A**
        (5)    Citation to the case (if you know): **N/A**
        (6)    Grounds raised: **N/A**
(h)    Did you file a petition for certiorari in the United States Supreme Court?
        Yes ☐     No ☒
        If yes, answer the following:
        (1)    Docket number or case number (if you know): **N/A**
        (2)    Result: **N/A**
        (3)    Date of result (if you know): **N/A**
        (4)    Citation to the case (if you know): **N/A**

10.    Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?[1]      Yes ☒       No ☐

11.    If your answer to Question 10 was "Yes," give the following information:
        (a)    (1) Name of court:  **In the 19th Judicial Circuit Court, in and for St. Lucie County, Florida**
                (2) Docket or case number (if you know): **562002-CF-1166A**
                (3) Date of filing (if you know): **March 22, 2005**
                (4) Nature of the proceeding: **A Motion to Correct Illegal Sentence pursuant to rule 3.800(a), Fla.R.Crim.P.**

                (5) Grounds raised:
                **The Defendant received an illegal sentence due to scoresheet error.**

                (6) Did you receive a hearing where evidence was given on your petition, application, or motion?   Yes ☐       No ☒
        (7)    Result: **Denied**
        (8)    Date of result (if you know): **May 16, 2005.**
        (b)    If you filed any **second** petition, application, motion, give the same information:
            (1)    Name of court: **In the 19th Judicial Circuit Court, in and for St. Lucie County, Florida**
            (2)    Docket or case number (if you know): **562002-CF-1166A**

---

[1] For clarity, the Petitioner has assigned numbers to each of the claim in the Petitioner's motions, supplemental motions, and refiled motions in the order in which they were raised below; such action is in good faith.

(3)    Date of filing (if you know):  **October 21, 2005.**

(4)    Nature of the proceeding:  **A Motion to Correct Illegal Sentence pursuant to rule 3.800(a), Fla.R.Crim.P.**

(5)    Grounds raised: **The trial court failed to state the sentences as consecutive at sentencing.**

(6)    Did you receive a hearing where evidence was given on your petition, application, or motion?                  Yes ☐                 No ☒

(7)    Result: **Denied.**

(8)    Date of result (if you know):  **April 3, 2006**

(c)    If you filed any **third** petition, application, or motion, give the same information:

(1)    Name of court:  **In the 19th Judicial Circuit Court, in and for St. Lucie County, Florida**

(2)    Docket or case number (if you know): **562002-CF-1166A**

(3)    Date of filing (if you know):  **May 31, 2006**

(4)    Nature of the proceeding: **3.850 Motion for Post-Conviction Relief**

(5)    Grounds raised:

**Ground One**

Defense counsel was ineffective for failing to request a *Frye* hearing and failing to object to DNA testimony absent a *Frye* hearing. Further, trial court made a reversal error for allowing scientific evidence to be presented to jurors without first conducting a *Frye* hearing.

**Ground Two**

Trial court committed fundamental reversible error for allowing the State to admit and elicit evidence and not granting defense counsel's motion for mistrial, **counsel made inadequate objection**.

**Ground Three**

Defense counsel was ineffective for failing to strike two biased jurors on voir dire.

**Ground Four**

Defense counsel was ineffective for failing to produce the Defendant at the bench for jury selection.

**Ground Five**

Counsel was ineffective for failing to investigate and call witnesses.

**Ground Six**

Defense counsel, the State and the trial court and violated the Defendant's right to confrontation and due process.

**Ground Seven**

Defendant was denied a fair trial, due process and equal protection of the law, resulting from the cumulative effect of counsel's acts and omissions rendering counsel ineffective.

**Ground Eight (Supplement to motion for post-conviction relief filed on June 29, 2006 as Ground Eight)**

Counsel was ineffective for failing to become familiar with forensic evidence and not presenting an expert testimony, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Florida Constitution.

**Ground Nine (Defendant's Amendment/Supplement to motion for post-conviction relief February 1, 2007 as Ground Nine)**

Newly discovered evidence as second hand hearsay recantation statement.

**Ground Ten (Motion for post-conviction relief pursuant to Fla.R.Crim.P. 3.850(h) filed on October 2, 2007 as Ground Ten and Eleven)**

The State Attorney's Office failed to file a valid information per Article I, Section 15(a), and 16, Florida Constitution (2002).

**Ground Eleven**

The police officer probable cause affidavit cannot be used as material to endorse the information.

**Ground Twelve (Supplemental Amendment to motion for post-conviction relief filed on December 28, 2007 as Ground Twelve)**

Trial counsel was ineffective for failing to become familiar with evidence, chain of custody and evidence tampering or an investigation and prepare a tampering defense or failure to challenge or objected to the admission of evidence, on the ground of tampering.

    (6)    Did you receive a hearing where evidence was given on your petition, application, or motion?            Yes ☒          No ☐

    (7)    Result: **Denied.**

    (8)    Date of result (if you know): **April 11, 2007, January 9, 2008, July 18, 2008, and August 11, 2008.**

(d)    If you filed any **fourth** petition, application, motion, give the same information:

    (1)    Name of court: **In the 19th Judicial Circuit Court, in and for St. Lucie County, Florida**

    (2)    Docket or case number (if you know): **562002-CF-1166A**

    (3)    Date of filing (if you know): **August 2, 2011**

    (4)    Nature of the proceeding: **Petition for Writ of Habeas Corpus pursuant to Ch. 79.01, Fla. Stat.**

    (5)    Grounds raised:

**Ground One**

Trial court lacked subject matter jurisdiction over the DNA evidence that was presented therefore making its judgment and sentence null and void in violation of the Petitioner's life and liberty.

**Ground Two**

Trial court's judgment of conviction is null and void due to the discovery of newly discovered evidence received on July 18, 2008 by an order from this Court which did expose a violation of due process which amounts to be prosecutorial misconduct and maliciously persecution which did vitiated the court's jurisdiction.

**Ground Three**

Prosecutorial misconduct and malicious prosecution as newly discovered evidence in violation of the Petitioner's due process and equal protection right to the United States and the Florida Constitution in all criminal prosecution the right to a fair trial.

**Ground Four**

Newly discovered evidence that fraud practice was committed on the trial court by a state witness.

**Ground Five (Second Amended motion for post-conviction relief filed on April 27, 2012)**

Prosecutorial misconduct and malicious prosecution when the Assistant State Attorney Ms. Kathryn M. Nelson, Florida Bar No. 402478, sided with the trial court appointed guardian ad counselor Ms. Lorraine A. Smith, Florida Bar No. 0021806, and conducted an illegal abortion on May 22, 2002, without the process of the Court pursuant to Section 390.0111(1)(3), Fla. Stat. (2002) and collected the illegal amniotic sac fluid for DNA testing, which prejudiced Mr. Khan throughout trial and on appeal.

    (6)    Did you receive a hearing where evidence was given on your petition, application, or motion?        Yes ☐        No ☒

    (7)    Result: **Dismissed with the opportunity to amend within 50 pages.**

    (8)    Date of result (if you know): **May 11, 2012**

(e)    If you filed any **fifth** petition, application, motion, give the same information:

    (1)    Name of court: **In the 19th Judicial Circuit Court, in and for St. Lucie County, Florida**

    (2)    Docket or case number (if you know): **562002-CF-1166A**

    (3)    Date of filing (if you know): **September 21, 2011**

    (4)    Nature of the proceeding: **Motion for NEW DNA Testing Pursuant to Fla.R.Crim.P. 3.853**

    (5)    Grounds raised:

**Ground One**

New DNA testing will exonerate Mr. Khan of the crimes charged in Count Three according to the father/daughter incest where the alleged child victim was five months and three pregnant and the evidence was conceived in Trinidad and Tobago not in the State of Florida (according to trial court records).

    (6)    Did you receive a hearing where evidence was given on your petition, application, or motion?        Yes ☐        No ☒

    (7)    Result: **Dismissed without prejudice with the opportunity to amend within 50 pages.**

    (8)    Date of result (if you know): **May 15, 2012.**

(f)    If you filed any **sixth** petition, application, motion, give the same information:

    (1)    Name of court: **In the 19th Judicial Circuit Court, in and for St. Lucie County, Florida**

    (2)    Docket or case number (if you know): **562002-CF-1166A**

    (3)    Date of filing (if you know): **June 27, 2012**

    (4)    Nature of the proceeding: **Motion for Post-Conviction Relief.**

    (5)    Grounds raised:

**Ground One**

Evidentiary hearing counsel was ineffective when counsel did not inform the Movant that she was a former prosecuting attorney for the 19th Judicial Circuit, State Attorney Mr. Bruce H. Colton's Office.

**Ground Two**

Evidentiary hearing counsel rendered ineffective representation by counsel having a social interest in the State Attorney's Office of Mr. Bruce H. Colton and intentionally did not file a motion for rehearing, knowingly knowing that the order rendered on July 18, 2008 was not a final order and still filed a notice of appeal.

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?  Yes ☐  No ☒

(7) Result: **Denied.**

(8) Date of result (if you know):  **August 28, 2012.**

(g) If you filed any **seventh** petition, application, motion, give the same information:

 (1) Name of court: **In the 19ᵗʰ Judicial Circuit Court, in and for St. Lucie County, Florida**

 (2) Docket or case number (if you know): **562002-CF-1166A**

 (3) Date of filing (if you know):  **November 21, 2012**

 (4) Nature of the proceeding: **Amended Re-Filed Motion for Post Conviction Relief**

 (5) Grounds raised:

**Ground One**

Newly discovered evidence of trial recantation testimony which shows prosecutorial misconduct and malicious prosecution in violation of the Petitioner's right to a fair trial.

 (6) Did you receive a hearing where evidence was given on your petition, application, or motion?  Yes ☐  No ☒

 (7) Result: **Dismissed without prejudice, with instructions to tamper with the State witness and to re-file the motion.**

 (8) Date of result (if you know):  **February 15, 2013**

(h) If you filed any **eighth** petition, application, motion, give the same information:

 (1) Name of court: **In the 19ᵗʰ Judicial Circuit Court, in and for St. Lucie County, Florida**

 (2) Docket or case number (if you know): **562002-CF-1166A**

 (3) Date of filing (if you know):  **March 20, 2013**

 (4) Nature of the proceeding: **Second Re-Filed Amended Motion for Post-Conviction Relief**

 (5) Grounds raised:

**Ground One**

Newly discovered evidence of trial recantation testimony which shows prosecutorial misconduct and malicious prosecution therein having subsection B through E.

**Ground Two**

Newly discovered evidence that trial counsel was ineffective when counsel did not investigate the DNA report where there was no Trinidadian database as the DNA report shows using a Trinidadian database.

 (6) Did you receive a hearing where evidence was given on your petition, application, or motion?  Yes ☐  No ☒

 (7) Result: **Denied.**

 (8) Date of result (if you know):  **June 16, 2015**

(g) If you filed any **ninth** petition, application, motion, give the same information:

 (1) Name of court: **In the 19ᵗʰ Judicial Circuit Court, in and for St. Lucie County, Florida**

 (2) Docket or case number (if you know): **562002-CF-1166A**

 (3) Date of filing (if you know):  **March 4, 2013**

 (4) Nature of the proceeding: **Motion for Disqualification of Post-Conviction Court Judge**

(5)    Grounds raised:

**Ground One**

Petitioner is being denied a fair and impartial judge where the judge, Mr. Robert E. Belanger, was a former prosecutor from the same prosecutor's office that prosecuted the Defendant maliciously now in his judgeship he cannot render a fair and impartial judgment because he has a personal stake in the outcome of the proceeding.

(6)    Did you receive a hearing where evidence was given on your petition, application, or motion?                                                     Yes ☐              No ☒

(7)    Result: **Denied.**

(8)    Date of result (if you know):  **March 8, 2013**

(h)    If you filed any tenth petition, application, motion, give the same information:

(1)    Name of court: **In the 19ᵗʰ Judicial Circuit Court, in and for St. Lucie County, Florida**

(2)    Docket or case number (if you know): **562002-CF-1166A**

(3)    Date of filing (if you know):  **June 19, 2013**

(4)    Nature of the proceeding: **Motion for Post-Conviction DNA Testing pursuant to Fla.R.Crim.P. 3.853**

(5)    Grounds raised:

**Ground One**

The previous DNA testing was inconclusive for it lacked a Trinidadian database which includes East Indian / South Asian population persons.

(6)    Did you receive a hearing where evidence was given on your petition, application, or motion?                                                     Yes ☐              No ☒

(7)    Result: **Denied.**

(8)    Date of result (if you know):  **April 11, 2014**

(i)    If you filed any **eleventh** petition, application, or motion, give the same information:

(1)    Name of court: **19ᵗʰ Judicial Circuit Court, in and for St. Lucie County, FL**

(2)    Docket or case number (if you know): **522002-CF-1166A**

(3)    Date of filing (if you know): **February 18, 2014**

(4)    Nature of the proceeding: **Petition for Common Law Certiorari**

(5)    Grounds raised:

**Ground One**

Whether Judge Dwight L. Geiger's order rendered on July 28, 2008 adopted and/or incorporated Judge James McCann's order rendered on April 11, 2007 which was denied as a non-final, non-appealable order and whether Judge Robert E. Belanger's order rendered on August 11, 2008 was a final order adopting and/or incorporating Judge James McCann's order rendered on April 11, 2007.

**Ground Two**

Whether counsel's notice of appeal filed on July 21, 2008 was clothed with the finality required to invoke the Appellate Court's jurisdiction on July 31, 2008 in case number 4D08-3124 over Judge James McCann's order rendered on April 11, 2007.

(6)    Did you receive a hearing where evidence was given on your petition, application, or motion?

Yes ☐          No ☒

(7)    Result: **Denied.**

(8)    Date of result (if you know): **March 6, 2014.**

(j)    If you filed any **twelfth** petition, application, or motion, give the same information:

(1)    Name of court: **19th Judicial Circuit Court, in and for St. Lucie County, FL**

(2)    Docket or case number (if you know): **522002-CF-1166A**

(3)    Date of filing (if you know): **February 19, 2015.**

(4)    Nature of the proceeding: **Defendant's Third Motion for Post-conviction Relief on the claim of Newly Discovered Evidence pursuant to Fla.R.Crim.P. 3.850(b)(1) (2014-2015).**

(5)    Grounds raised:

**Ground One**

Newly Discovered Evidence that was willfully withheld by the State in violation of the 5th, 6th, 8th and 14th amendment rights under both the United States and Florida Constitutions, the right to have a fair and impartial trial by the State which warranted a new trial.

**Ground Two**

Newly Discovered Evidence which warrants a new trial where at trial the State prosecuting attorney knowingly allowed a DNA expert (her husband) to testify falsely concerning the DNA material he received for paternity DNA testing in violation of *Giglio*, which violated Mr. Khan's rights to due process of law pursuant to the 5th, 6th, 8th, and 14th Amendment rights under the United States and Florida Constitutions which warrants dismissal of all charges and/or a new trial.

**Ground Three**

Newly Discovered Evidence reveals that the State had actually destroyed the actual physical evidence, the aborted fetus, on May 21, 2002 and failed to disclose the destruction of the evidence to the defense in pre-trial proceedings, at trial, and during collateral proceedings, denying the Movant a fair and impartial trial in violation pursuant to the 5th, 6th, 8th, and 14th Amendment rights under the United States and Florida Constitutions which warrants dismissal of all charges and/or a new trial.

(6)    Did you receive a hearing where evidence was given on your petition, application, or motion?        Yes ☐

No ☒

(7)    Result: **Denied**

(8)    Date of result (if you know): **June 15, 2015.**

(i) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

| | | | | | |
|---|---|---|---|---|---|
| (1) | First petition: | Yes ☒ | No ☐ | 4D05-2422 | |
| (2) | Second petition: | Yes ☐ | No ☒ | | |
| (3) | Third petition: | Yes ☒ | No ☐ | 4D08-3124 | |
| (4) | Fourth petition: | Yes ☒ | No ☐ | 4D12-2835 | |
| (5) | Fifth petition: | Yes ☐ | No ☒ | | |
| (6) | Sixth petition: | Yes ☒ | No ☐ | 4D12-349, SC12-2433, SC13-2021 | |
| (7) | Seventh petition: | Yes ☐ | No ☒ | | |
| (8) | Eighth petition: | Yes ☐ | No ☒ | Denied access to court | |
| (9) | Ninth petition: | Yes ☒ | No ☐ | 4D13-1296, SC13-1781 | |
| (10) | Tenth petition: | Yes ☒ | No ☐ | 4D14-2597 | |
| (11) | Eleventh petition: | Yes ☒ | No ☐ | 4D14-2143 | |
| (12) | Twelfth petition: | Yes ☐ | No ☒ | Denied access to court | |

(j) If you did not appeal to the highest state court having jurisdiction, explain why you did not:
**I did not appeal the Second, Fifth and Seventh petitions because the issues were insufficient for relief prayed for. I did not appeal the Eighth and Twelfth petition because I was sanction and prohibited from that court's jurisdiction on the eleventh petition in case no. 4D14-2143. I did not seek Supreme Court of Florida review because a per curiam affirmed opinion cannot invoke that Court's jurisdiction on the first, third, fourth, ninth, tenth, and eleventh petitions. However, I did seek Florida Supreme Court review over the sixth and ninth petitions in good faith.**

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, treaties of the United States. Attach additional pages if you have more than four grounds. State the <u>facts</u> supporting each ground.

GROUND ONE: **Defense counsel was ineffective for failing to request a *Frye* hearing and failed to object to DNA testimony absent a *Frye* hearing. Further, trial court made reversible error for allowing scientific evidence to be presented to jurors without first conducting a *Frye* hearing.**
(a) **SUPPORTING FACTS:** The State court unreasonably applied clearly established Federal law by failing to consider Defendant's postconviction *Frye* claim without first conducting an evidentiary hearing where trial counsel allowed the DNA expert at trial, who was married to the prosecutor in this case, to testify as the DNA evidence. Counsel allowed the DNA expert to conduct paternity DNA testing in a laboratory that was not licensed or accredited to present evidence in a court of law. When the Petitioner stated to wit:

This issue is facially and legally sufficient to avoid summary denial. See, *Hadden v. State*, 690 So.2d 573 (Fla. 1997).

Today, DNA is looked at as the Gold Standard of forensic science. Indeed, there has been no escape from the onslaught of newspaper, magazine and T.V. news stories celebrating the greatest crime fighting tool of the 21st century. A simple cotton swab of the mouth has enabled police to solve cold case and examine evidence ranging from the Oklahoma City bombing to the space shuttle crash to the terrorist attack on the twin towers in New York. The science itself is good, but because humans do the testing and inherent frailty is attached.

The fundamental problem with forensic science in laboratories – whether it is DNA, hair, handwriting, ballistics – is that unlike clinical labs, forensic science labs are unregulated by an governmental entity. The criminal forensic labs set their own standards. They purport to govern themselves and judges allow self-regulating evidential testimony from these labs admissible in courtrooms across the county. A steak sold at Winn Dixie has been inspected by the U.S. Department of Agriculture, and thy say it is safe to eat. Would a person feel the same if it was

inspected by the Meat Packers Association? This type of oversight is what is happening in crime labs. The United States does a better job of testing dog food labs than forensic science labs.

These laboratories, like the one in the instant case, "Indian River Crime Lab," are intrinsically bonded to law enforcement, and the problem is with the technicians and the inherent human frailty. Their job is not objective science. No, they are part of the cop shop.

Since 1923, safeguards have been in place for the courts to analyze and limit forensic evidence and testimony. See, *Frye v. United States*, 293 F.1013 (D.C. Cir. 1923). Novel scientific evidence is not admissible in Florida unless it meets the test established in *Frye*, supra which requires that such evidence "be sufficiently established to have gained general acceptance in that particular field in which it belongs." *Flanagan v. State*, 625 So.2d 827 (Fla. 1993); Accord *Hadden v. State*, 690 So.2d 573 (Fla. 1997); *Ramirez v. State*, 651 So.2d 1164 (Fla. 1995). When applying the *Frye* test, "the burden is on the proponent of the evidence to prove [by the greater weight of the evidence] the general acceptance of both the underlying scientific principle and the testing procedures used to apply that principle to the facts of the case at hand." *Id.* at 1168. This requires more than a "bold assertion by the expert that his dedication is premised upon well-recognized scientific principles." *Ramirez v. State*, 810 So.2d 836 (Fla. 2001) (*Ramirez III*). As our Supreme Court has emphasized, "general scientific recognition requires the testimony of impartial experts or scientists. It is this independent and impartial proof of general scientific acceptability that provides the necessary *Frye* foundation." *Id.* at 851.

The Defendant would like this Court to look first at the testimony of Mr. Ritzline, the technician that testified to conducting the DNA tests and interpreting the data. Although Mr. Ritzline might be deemed an expert in DNA testing, he cannot be seen as impartial as required by our Florida Supreme Court. Beside the fact that the laboratory he is in employ is bonded to law enforcement, Court records show that Mr. Ritzline is and was married to the prosecutor in the Defendant's trial, Ms. Kathryn M. Nelson. (T.522). This is a conflict to close for legal comfort.

Further, there is no impartial and independent proof that "Indian River Crime Lab" has been generally accepted into the scientific community to perform DNA analysis. In fact, the record indicates that "Indian River Crime Lab" holds no accreditation or certification. (T.485). Mr. Ritzline on direct examination:

Q.          Is the actual laboratory licensed or accredited?
A.          Not at this time. We are working towards that … Accreditation or certification process of laboratories is extensive and very time consuming … it just doesn't happen overnight.

Because "Indian River Crime Lab" is not licensed, accredited, or certified in DNA analysis, the qualifications of the testing and its results are clearly erroneous, thus inadmissible at trial. Trial court's failure to conduct a *Frye* hearing and counsel's failure to request one, or object to the admissibility of the DNA evidence is reversible error.

In gauging acceptance, the Court must look to properties that traditionally under review, i.e., "idicia" or "hallmarks" of acceptability. Mr. Ritzline is shown on the record on the as giving seven (7) pages of self-aggrandizing – tooting of his own professional horn testimony. As cited in *Ramirez*, supra, bold assertions by an expert is inadequate to establish evidence admissibility if the witness' application of scientific principles are untested and lacks indicia of acceptability. It is incomprehensible to reasonable believe that an uncertified laboratory would be accepted in the scientific community and even more importantly than any uncertified results of tests could be used in a court of law. The test results from the "Indian River Crime Lab" must be considered less than reliable for courtroom use.

The trustworthiness of expert testimony is especially important because of ten time the jury will naturally assume that the scientific principles underlying the experts' conclusion are valid. Here, the errors were compounded further when the State called its next witness after Mr. Ritzline, Dr. Martin Tracy, a professor of biological sciences at Florida International University

in Miami. Dr. Tracy gave expert testimony in the field of population genetics. However, his testimony, so like Mr. Ritzline's, was flawed to the point of erroneous and inadmissible.

As our Supreme Court has noted, "DNA testing requires a two-step process, one biochemical and the other statistical. The first step uses principles of molecular biology and chemistry to determine that two DNA samples look alike. The second step uses statistics to estimate the frequency of the profile in the population. Both steps must satisfy the *Frye* test." *Butler v. State*, 842 So.2d 817 (Fla. 2003) citing *Brim*, 695 So.2d 268. Here, the Defendant has shown that the State would have fallen far short of meeting the first step of the *Frye* test, had there been one. Moreover, the Defendant will clearly show that the State could not have met their second step of the necessary burden.

The Defendant contends, that absent an objection from defense counsel, the trial court erroneously admitted evidence purportedly derived from what the State expert terms the Broward County and Trinidadian database. (T.550).

First, the State failed to provide any documentation for the record that these databases even exist, or that they are accepted in the general scientific community. Dr. Tracy's testimonial to his vast education and experience in population genetics, alone, cannot and does not meet the second step requirement in *Frye*. The Court erred in allowing Dr. Tracy's testimony without prior, pretrial outside of the jurors' presence, specific documentation that his opinion was based on data generally accepted in the scientific community. Further, defense counsel was ineffective for failing to object.

The burden is on the proponent of the evidence to prove the general acceptance. The general acceptance under the *Frye* test must be established by a preponderance of the evidence. See, *Murry v. State*, 692 So.2d 157 (Fla. 1997). In the case at bar, the Court failed to conduct the step by step inquiry set out in *Ramirez*, as to whether the DNA typing, the methods and the probability calculations used to report the test results could be admitted at trial – a determination that is the trial judge's alone to make. Instead, the Court simply allowed the DNA evidence to be admitted at trial under the faulty rationale that the scientific principles underlying this evidence was more appropriately resolved by the jury as a matter of weight. In *Murry*, the Court stated: "It is exactly this mistake which we have cautioned trial judges not to make." See, *Ramirez*, supra.

Further, a large percentage of Dr. Tracy's testimony was error and inadmissible. Dr. Tracy relied on population frequency statistics gained by Mr. Ritzline at the crime lab. On T, p. 542, the defense objects, the Court sustained and gave a curative introduction to the jury to disregard statistics.

However, the record is void of any testimony from Dr. Tracy as to population frequency statistics. There was simply nothing for the jury to legally make a determination. The all important second st3ep is missing. The National Research Council (NRC) explained the need for the second step, of which our Supreme Court has adopted. The 1992 report states:
"To say that two patterns match, without providing any scientifically valid estimate, or at least an upper bound, of the frequency with which such matches might occur by chance is meaningless ... Except for strong claims of uniqueness, purely qualitative presentations suffer from ambiguity."

The State failed miserably with this witness and any lawful resemblance of DNA presentation. It is well established that the DNA testing process must consist of two distinct steps and that both steps must satisfy requirements of *Frye*. In *Brim v. State*, 695 So.2d 268 (Fla. 1977), the Supreme Court stated that both steps of the DNA process must independently meet the *Frye* standard for admissibility and again emphasized the critical role that the trial judge plays in this inquiry before such evidence is presented to the jury. The record in this case will stand on its own. There was no pretrial inquiry into the admissibility of the DNA evidence. Not even an attempt. Dr. Tracy based his conclusion that the Defendant was the father, from information supplied by an uncertified laboratory and a database that he had no knowledge of, other than it

came from the uncertified lab of Mr. Ritzline. The State completely failed to carry its burden as the proponent of the DNA evidence.

Further, (T.550), Dr. Tracy testified that he used two databases, the Trinidadian and Broward County. He stated that "when you use different databases, you get a slightly different answer. But the <u>qualitative</u> conclusion is almost always the same." The <u>qualitative</u> conclusion he arrived at is another error. The NRC report published in 1992 and 1996 warned: "Purely qualitative presentations suffer from ambiguity."

"Professional forecasters, physicians, science writers, students and soldiers show high variability in translating verbal probability expressions. Judges and jurors are likely to show a similar variability in interpreting the meaning of such verbal expressions. To help a court or jury to understand the importance of a match, most experts provide quantitative rather than qualitative, estimates of the frequency of an incriminating profile…"

Moreover, Dr. Tracy did not demonstrate a sufficient knowledge of the two databases or any authoritative sources. In fact, as seen at (T.550), his source of information that he based his conclusions on came from the uncertified lab.

A.      …. I was simply sent the information from the crime lab and decided to use that database.

Dr. Tracy purports that this "Trinidadian database came from the Journal of Forensic Science. However, the record is devoid of any qualification or that it is accepted in the scientific community for population frequency determinations.

Further, any database made up of a cross-cut of people with a family heritage from Trinidad would be inconsistent and irrelevant for frequency statistics in this case. Roger Khan's paternal heritage is East India and Pakistan.

## PREJUDICE

It is without a doubt that the jury relied heavily on the DNA evidence presented by the State. There is also no doubt that had a *Frye* hearing been conducted, the DNA evidence would have been ruled inadmissible. Therefore, harmless error cannot be attached and reversible prejudice is established.

Moreover, the trial court committed fundamental reversible error when it failed to conduct a *Frye* hearing.

Further, had counsel objected and preserved this issue for direct appeal, the District Court would have certainly reversed.

Absent the unlawful DNA evidence, it is entirely reasonable to believe that the Defendant could not have stood trial for the crimes he was accused of. The only other evidence the State had was hearsay. That alone could not support a conviction.

Thus, prejudice is established.

(b)     If you did not exhaust your state remedies on **Ground One**, explain why: **A per curiam affirmed opinion cannot invoke the jurisdiction of the Supreme Court of Florida.**

(c)     **Direct appeal of Ground One:**
(1)     If you appealed from the judgment of conviction, did you raise this issue?      Yes ☐  No ☒
(2)     If you did <u>not</u> raise this issue in your direct appeal, explain why: **My counsel omitted the issue and the appellate judge panel accepted the DNA evidence as overwhelming evidence of guilt and denied relief, per curiam affirmed. (See Appendix 8).**

(d)     **Post-Conviction Proceedings:**
(1)     Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
Yes ☒                    No ☐
(2)     If your answer to Question (d) (1) is "Yes," state:
Type of motion or petition: **a timely filed Motion for Post-Conviction Relief pursuant to Fla.R.Crim.P.**

**3.850**

Name and location of the court where the motion or petition was filed:  **19th Judicial Circuit in and for St. Lucie County, Florida, P.O. Box 700, Ft. Pierce, FL 34954**

Docket or case number (if you know): **562002-CF-1166A**
Date of the court's decision: **April 11, 2007**
Result (attach a copy of the court's opinion or order, if available): ( **See, Appendix 1).**
(3) Did you receive a hearing on your motion or petition?                              Yes ☒ No ☐
(4) Did you appeal from the denial of your motion or petition?                    Yes ☒ No ☐
(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal?   Yes ☒ No ☐
(6) If your answer to Question (d) (4) is "Yes," state:

> Name and location of the court where the motion or petition was filed:  **Fourth District Court of Appeal, 1525 Palm Beach Lakes Blvd., West Palm Beach, FL 33401**
> Docket or case number (if you know): **4D08-3124**
> Date of the court's decision:  **May 25, 2011**
> Result (attach a copy of the court's opinion or order, if available):  **Denied per curiam affirmed, See Appendix 2**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue:
**N/A**

(e)    **Other Remedies:** Describe any other  remedies (such as habeas corpus, administrative remedies, etc) that you have used to exhaust your state remedies on **Ground One**: On August 2, 2011, Petitioner filed a petition of habeas corpus, and amended motion was filed on November 21, 2012, and a second amended motion on March 20, 2013, concerning ground one within the motions subsection, in ground one and two. See subsection (*Id.* p. 21 and Ground One, *Id.* p. 38).

**GROUND TWO**: Defense Counsel was ineffective for failing to strike two prospective jurors who stated they could not presume Petitioner innocent.
(a) **SUPPORTING FACTS**: The State court's denial of this claim was an unreasonable application of clearly established Federal law as articulated in Strickland v. Washington. This claim was denied after an evidentiary hearing based on counsel's testimony at the hearing. (See Appendix 10 ; Transcript of evidentiary hearing). When the Petitioner stated to wit:

> This issue of ineffective assistance of counsel for failing to strike biased jurors is facially and legally sufficient to avoid summary denial. See, *Williams v. State*, 673 So.2d 960 (Fla. 1st DCA 1996).

> Juror challenge on voir dire plays a critical and important role in reinforcing a defendant's constitutional right to trial by an impartial jury. The mere presence of a qualified biased juror is a structural defect in the constitution of the trial mechanism itself. In the instant case, there were two such incompetent jurors.

> The record reflects on (TT.122), the following colloquy occurred between the defense counsel and prospective juror Nellie Espinoza.

| Counsel: | ... do you think that somebody could be accused of a crime and be innocent? |
|---|---|
| Ms. Espinoza: | Yes. |
| Counsel: | Do you think that somebody could be accused of a crime that has been put in front of you today and still be innocent? |
| Ms. Espinoza: | No. |
| Counsel: | So there's no way that you could presume – extend that presumption of innocence to my client? |
| Ms. Espinoza: | No. |
| Counsel: | You could not. I appreciate your honesty. |

It is inconceivable that counsel allowed Ms. Espinoza to become a juror in his client's cause. Moreover, there can be no excuse for allowing so blatant bias to sit on the Defendant's jury.

On such biased juror is a fundamental reversible error. In the instant case there were two, (TT.125-6):

| | |
|---|---|
| Counsel: | … Ms. Torres, do you believe my client could be here accused of these crimes and still be innocent? |
| Ms. Torres: | I don't think so. |
| Counsel: | Do you think that you could be fair in this case? I mean do you think you could give a presumption of innocence until you heard all the evidence? |
| Ms. Torres: | Maybe. |
| Counsel: | Maybe? But you don't think – You think – you don't think you could be fair? |
| Ms. Torres: | No. |
| Counsel: | Thank you, … I appreciate your candor. |

The record in this case is quite celar. Defense counsel never made any attempt to strike tehse obviously biased jurors. At statke is the Defendant's right guaranteed by the Sixth Amendment to an impartial jury. The record shows a conspicuyous lack of response, by both counsel and the trial judge to Torres and Espinoza's clear declaration that they could not be fair jurors. There was no follow-up questioning or rehabilitation. There were no assurances of impartiality.

It is well settled that a court must excuse a prospective juror if actual bias is discovered during voir dire. In the instant case, Torres and Espinoza made an express admission of that fact. Both made an open and forthright declaration. Further, there is no ambiguity in the record as to their bias.

Given that not one, but two biased jurors were impaneled in this case, prejudice under **_Strickland_** is presumed, and a new trial is required. State and Federal law is clear. The presence of a biased juror cannot be harmless. Nor can counsel's decision not to challenge a biased venire person constitute sound trial strategy. If so, sound trial strategy would include counsel's decision to waive, in effect, a criminal defendant's right to an impartial jury.

Further, there was a complete lapse by the trial court in carrying out its obligation on voir dire. The Sixth Amendment requirements apply regardless of whether blame for a biased jury is assigned to counsel or the Court, who ultimately share the voir dire responsibility of removing biased venire persons. The presiding trial judge has the authority and responsibility, either sua sponte or upon counsel's motion to dismiss prospective jurors for cause.

Conviction from a biased jury must be reversed.

(b)    If you did not exhaust your state remedies on **Ground Two**, explain why: **A per curiam affirmed opinion cannot invoke Florida Supreme Court jurisdiction.**

(c)    **Direct appeal of Ground Two:**
(1)    If you appealed from the judgment of conviction, did you raise this issue?    Yes ☐ No ☒
(2)    If you did <u>not</u> raise this issue in your direct appeal, explain why:

**My counsel omitted the issue without my consent and I had no knowledge of the issue and had the issue been raised on appeal the outcome would have been different. See Appendix 8.**

(d)    **Post-Conviction Proceedings:**
(1)    Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
                    Yes ☒                    No ☐
(2)    If your answer to Question (d)(1) is "Yes," state:
Type of motion or petition: **Motion for Post-Conviction Relief pursuant to Fla.R.Crim.P. 3.850 on ineffective assistance of counsel claims.**

Name and location of the court where the motion or petition was filed: **19th Judicial Circuit in and for St. Lucie County, Florida, P.O. Box 700, Ft. Pierce, FL 34954**

Docket or case number (if you know): **562002-CF-1166A**
Date of the court's decision: **July 18, 2008**
Result (attach a copy of the court's opinion or order, if available): **Denied (See Appendix 3).**
(3) Did you receive a hearing on your motion or petition? **See Appendix 10**
Yes ☒ No ☐
(4) Did you appeal from the denial of your motion or petition?                           Yes ☒ No ☐
(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal?   Yes ☒ No ☐
(6) If your answer to Question (d) (4) is "Yes," state:
      Name and location of the court where the motion or petition was filed: **Fourth District Court of Appeal, 1525 Palm Beach Lakes Blvd., West Palm Beach, FL 33401**
      Docket or case number (if you know): **4D08-3124**
      Date of the court's decision: **May 25, 2011**
      Result (attach a copy of the court's opinion or order, if available): **Denied per curiam affirmed, See Appendix 2.**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue:   **N/A**

(e)    **Other Remedies:** Describe any other remedies (such as habeas corpus, administrative remedies, etc) that you have used to exhaust your state remedies on **Ground Two:**
**I cannot seek Supreme Court of Florida review because I got a per curiam affirmed opinion from the Fourth District Court of Appeal.**


**GROUND THREE: Counsel was ineffective for failing to investigate and call witnesses.**
(a) **SUPPORTING FACTS:** The State court's summary denial of this claim was an unreasonable application of clearly established Federal as articulated in Strickland v. Washington. When the Petitioner stated to wit:

    A claim of ineffective assistance of counsel for failing to investigate and call witnesses is facially and legally sufficient to avoid summary denial. See, *Light v. State*, 796 So.2d 610 (Fla. 2nd DCA 2000).

    It is obvious that an ill-informed jury, one that reaches a conclusion based solely on state sponsored evidence, is a foregone inherently prejudicial panel that is left with little choice but to convict. The Defendant avers that his counsel was ineffective for failing to investigate and call available exculpatory witnesses; all of whom counsel knew existed as well as what information they possessed. Instead, counsel made a decision to proceed to trial with virtually no defense whatsoever. In fact, counsel did not call any witnesses.

    The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, (1984), has said that judges deciding this type of claim in a post-conviction motion must look at the "totality" of evidence that was presented in court during trial. If that is the standard of review, then the flip-side of that coin is just as important and applicable. A court should also look at the "total lack" of evidence that was not presented.

    In the case at bar, the record reflects no transparent trial strategy or theory of defense. Only an abundance of objections. Counsel told the Defendant numerous times, "no victim, no crime." That is to say that if the State could not or would not produce the alleged victim, Nakita Khan at trial, then the all important burden of proof could not be met. This incompetent form of reasoning is definitive of misrepresentation and ineffectiveness.

    A defense attorney's actions are usually based, and quite properly so, on informed strategic choices made by the evidence and on information supplied by the defendant. In particular, what investigative decisions are reasonable depends critically on such information. In

the instant case, defense counsel was given the identity of each of these witnesses, with the necessary information that even with minimal preparation counsel should have been aware that further investigation of these witnesses was necessary and essential in order to properly prepare a reasonable defense.

The *Strickland* court, supra, stated: "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary." This standard requires no special amplification in order to define counsel's duty to investigate. Counsel was woefully ineffective and the facts herein support this claim and will become obvious.

There is a strong presumption of reasonableness that must be overcome, and strategic or tactical decisions made by counsel after a thorough investigation are virtually unchallengeable. *Downs v. State*, 437 So.2d 1102 (Fla. 1984). However, the severity and nature of this case demanded a thorough investigation of all the facts surrounding it. Counsel had pretrial knowledge of a score of potential witnesses and information that was critical to formulating a viable defense. Therefore, counsel had no lawful reason, strategic, tactical or otherwise, for not investigating or calling these witnesses.

Failure to investigate and use the following witnesses in order to formulate a viable defense was measurably below that of competent counsel.

The controlling authority is *Highsmith v. State*, 617 So.2d 825 (Fla. 1st DCA 1993), which after higher review, outlines three applicable components in order to establish this type of claim. The three components are: 1) identification of the witnesses; 2) substance of their testimony; 3) description of prejudice suffered due to omission of testimony.

These available witnesses were:

Rashita Joseph

Mrs. Joseph is the Defendant's mother, and lives in Trinidad. The alleged victim, Nakita, prior to coming to the United States to live with the Defendant, lived at the home of Mrs. Joseph, Nakita's grandmother.

Without a doubt, the most important piece of knowledge Mrs. Joseph had, was the fact that Nakita was pregnant prior to moving to the United States. And the undeniable fact that the Defendant had not been to Trinidad in years, and could not possibly have contributed to Nakita's pregnancy, makes it inconceivable as to why this witness was not called by the defense to testify. A simple pretrial deposition of this witness could have possibly shortstopped the State from even prosecuting the Defendant.

Mrs. Joseph would have related her granddaughter's promiscuousness and would have testified to the reason Nakita lied to authorities was that her father, the Defendant, beat her on March 2, 2002, after he caught Nakita having sex and threatened to send her back to Trinidad.

Mrs. Joseph would have further testified that after Nakita returned to Trinidad she again became pregnant. The prejudice the Defendant suffered from counsel failing to utilize this witness is clear. A reiteration would be redundant and unnecessary.

Raj Gaishwar Surklall

Mr. Surklall would have testified that on March 1, 2002, the Defendant and his children, Robelto and Nakita, spent the night in his home. Also present that night was Mr. Surklall's nephew, Visnew Nerjara. This witness would relate that in the early hours of March 2, 2002, the Defendant awoke to use the bathroom and found Nakita and Nerjara having sex. Mr. Surklall would further state that the Defendant then became angry and beat Nakita, leaving the bruising that Dr. Rosa erroneously testified to at trial. This witness would have testified that Nakita was having sex in his home on other occasions with Ravindra Singh. Mr. Surklall had knowledge that Singh had been arrested and charged with sexual battery of a minor.

Mr. Surklall was present when the Defendant told his children he was sending them back to their mother in Trinidad for their behavior. Mr. Surklall was later told by Robelto and Nakita how angry they were at this threat, and that they would do anything to stay in the United States.

The prejudice here is apparent. Even a simple pretrial deposition from this witness may have caused the state to drop the charges against the Defendant, or in the alternative, caused him at least pursue another avenue. Counsel knew that Nakita was having sex with the adults, Nerjara and Singh, and failed to do any investigation, or at least point the State in their direction. Counsel should have moved for DNA analysis from Nerjara and Singh.

Kismati Simone

A friend of Nakita's and the Defendant.

Ms. Simone's testimony would have pretty much mirrored that of the others. Moreover, because of Simone's and Nakita's relationship, it is reasonable to believe that a conversation by counsel, with this witness, would have produced a wealth of exculpatory evidence.

Counsel's failure to do any pretrial investigations rendered this representation woefully inadequate.

Nakita Khan

Counsel was ineffective for not rigorously pursuing the alleged victim's recantation. Nakita sent letters to counsel and the Court asserting she lied because she was mad that the Defendant beat her for having sex and was afraid she would be sent back to Trinidad to live with her mother.

Further, counsel should have tried every means available to get this witness to trial, or at the very least, obtain a sworn deposition.

Thus, prejudice is established.

## CONCLUSION

There can be no excuse for counsel's failure to investigate and make use of these witnesses. In fact, if a proper investigation had been done it is highly likely additional exculpatory evidence would have been revealed.

Defendant requested that counsel obtain DNA from Singh and Nerjara in the event that the sonogram dating was inconclusive exonerate the Defendant before trial. After all, these adults were having sexual relations with his daughter Nakita. It is interesting to note here that both of these men were arrested and convicted of sexual battery on a minor after the Defendant's arrest.

Prejudice is clearly established and this case as a whole in light of counsel's "No victim, no crime," theory of defense. A do nothing attitude is measurable below that of competent counsel.

(b)    If you did not exhaust your state remedies on **Ground Three**, explain why: **N/A**

(c)    **Direct appeal of Ground Three:**

    (1)    If you appealed from the judgment of conviction, did you raise this issue?    Yes ☐  No ☒

    (2)    If you did <u>not</u> raise this issue in your direct appeal, explain why:

    **The issue was not preserved for appellate review.**

(d)    **Post-Conviction Proceedings:**

    (1)    Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

            Yes ☐            No ☒

    (2)    If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: **Motion for Post-Conviction Relief pursuant to Fla.R.Crim.P. 3.850.**

Name and location of the court where the motion or petition was filed:  **19th Judicial Circuit in and for St. Lucie County, Florida, P.O. Box 700, Ft. Pierce, FL 34954**

Docket or case number (if you know): **562002-CF-1166A**

Date of the court's decision: **April 11, 2007**

Result (attach a copy of the court's opinion or order, if available): **Denied, See Appendix 1.**

(3) Did you receive a hearing on your motion or petition?          Yes ☒ No ☐

(4) Did you appeal from the denial of your motion or petition?          Yes ☒ No ☐
(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal?   Yes ☒ No ☐
(6) If your answer to Question (d) (4) is "Yes," state:

    Name and location of the court where the motion or petition was filed: **Fourth District Court of Appeal, 1525 Palm Beach Lakes Blvd., West Palm Beach, FL 33401**

    Docket or case number (if you know): **4D08-3124**

    Date of the court's decision: **May 25, 2011**

    Result (attach a copy of the court's opinion or order, if available): **Denied per curiam affirmed, See Appendix 2.**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue:
**N/A**

(e)     **Other Remedies:** Describe any other remedies (such as habeas corpus, administrative remedies, etc) that you have used to exhaust your state remedies on **Ground Three:**
    **A per curiam affirmed opinion cannot proceed any further in Florida.**


**GROUND FOUR: Defense counsel, the State and the trial court violated the Defendant's right to confrontation and due process.**

(a) **SUPPORTING FACTS**: The State court unreasonably applied clearly established Federal law as articulated in Strickland v. Washington, by summarily denying this claim without an evidentiary hearing or giving the Petitioner an opportunity to amend the claim. When the Petitioner stated to wit:.

    This issue is facially and legally sufficient to avoid summary denial. See, *Conner v. State*, 748 So.2d 950 (Fla. 1999).

    The right of confrontation of witnesses serves a three-fold purpose because it: 1) ensures that witness will give his statement under oath, thus impressing him or her with the seriousness of the matter and guarding against lies by the possibility of penalty of perjury; 2) false witness to submit to cross-examination, "the greatest legal engine ever invented for the discovery of the truth"; and 3) permits jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility. *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

    The Sixth Amendment of the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ..." See, *Idaho v. Wright*, 497 U.S. 805, 813 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). This basic right echoed in Article I, Section 16(a) of the Florida Constitution. The Florida Supreme Court has previously observed that "the right to confrontation has been a cornerstone of Western society for a number of centuries." *Harrel v. State*, 709 So.2d 1364 (Fla. 1998).

    In the instant case, the Defendant was denied this fundamental right in a number of different ways.

    The alleged victim, Nakita, did not testify at Defendant's trial. Moreover, she never gave a deposition. The State, in prosecuting Defendant, used hearsay testimony and unlawful DNA results to convince a jury to convict. (A partially biased as shown in Ground Four (Three)). Dr. Rosa was allowed to testify over objection, and as an exception to the hearsay rule 90.803(4), under "medical diagnosis and treatment." However, testimony of Dr. Rosa, a child protection team doctor concerning examination of the alleged victim, did not qualify for the "medical diagnosis or treatment" hearsay exception, as there was no indication that the examination was for any purpose other than to find physical corroborating allegations of abuse. See *Bradley v. State*, 546 So.2d 445 (Fla. 1st DCA 1989); *Bagley v. State*, 483 So.2d 70 (Fla. 4th DCA 1986); *Sampson v. State*, 541 So.2d 733 (Fla. 1st DCA 1989). Further, Dr. Rosa's identification of Defendant in her testimony (shown in Ground Three (two)) was clear error. See *State v. Jones*, 625 So.2d 821, 826 (Fla. 1993) (holding that a child's statements to a medical provider as to the

identity of the child's abuser are inadmissible under 90.803(4); See also *Escoto v. State*, 624 So.2d 836, 837 (Fla. 5th DCA 1993), and reversible error.

It is a fundamental principle of criminal law that the prosecution, in presenting a prima facie case, must establish beyond a reasonable doubt the identify of the perpetrator of the charged offense. *Ponsell v. State*, 393 So.2d 635, 636 (Fla. 4th DCA 1981). Uncorroborated hearsay statements cannot be used as the sole evidence to convict as the State attempted in this case. See *Bell v. State*, 569 So.2d 1322 (Fla. 1st DCA 1990). Defense counsel moved for a mistrial after Dr. Rosa's identification. The Court denied counsel's request asserting that there was an "admission of guilt" from the witness Robelto Khan, who alleged that the Defendant told him he had sex with Nakita. However, in Robelto's police report, he claims that Nakita said she had sex with the Defendant. Counsel failed miserably to impeach Robelto and make the Court aware of this in the motion for mistrial. Thus, thwarting Defendant's right to confrontation.

Moreover, the State and the trial court violated the precepts mandated in section 90.803(23).

1. The alleged victim does not meet the 11 years of age or under as required by this rule.

2. There was no hearing done outside of the jury's presence that the statements made to Dr. Rosa met the requirements under this rule.

3. The alleged victim did not testify at trial, nor did she ever give a pretrial deposition. In fact, the record reveals through other witnesses and sources that Nakita wanted to recant and was afraid she would get into trouble for lying. This alone completely ruins any hearsay exceptions because it calls into question the validity of any statements the alleged victim ever made.

4. There was no testimony that the alleged victim would suffer service emotional or mental harm by testifying.

5. Defendant was not afforded the statutory 10 day notice.

6. The Court, as required by this rule, did not make the required findings of fact, nor were they placed on the record as mandated.

Further, Nakita was never legally unavailable. The record reveals that there were no problems obtaining funds for the State and defense counsel to fly to Trinidad and depose Nakita. The record also reveals that Nakita wanted to come to the United States to testify, and recant, but was afraid she would get into trouble. Defendant's sister testified to this fact, and Nakita wrote letters to the State, trial court and defense counsel. A simple assurance from the State and the Court, to Nakita, that she would not get into trouble would have allowed her to testify. No such assurances were made and therefore violated further Defendant's constitutional rights to confrontation.

Counsel also failed to properly confront DNA evidence. As shown in ground one (two of §2254), counsel did not request a *Frye* hearing or even research the intricacies of DNA evidence. Defendant told his attorney that Nakita was pregnant before coming to live with him in Florida. This fact alone should have caused counsel to obtain the medical report; specifically, the sonogram results that computer dated the fetus prior to Nakita's abortion. Nakita told Defendant the technician at the clinic told her the sonogram showed her to be 5 months and 3 weeks pregnant.

Because Nakita had not been in the United States for 5 months and 3 weeks, and Defendant could not have possibly been the father of the fetus, that one piece of exculpatory evidence would have reasonably assured the Defendant being found not guilty. Counsel failed to

obtain this critical piece of evidence, further violating the Defendant's right to confrontation and due process.

It is also shown in the pretrial record that the Defendant's sister, Ada Daniel, had knowledge of Nakita's sexual behavior, and could identify all the adults in question. However, the State was successful in limiting any possible testimony.

Finally, because dc was under the misguided assumption that "no victim, no crime," and that the jury could not convict absent live testimony from Nakita, counsel failed to assure the Defendant's right to confront his accuser.

## CONCLUSION

The prejudice Defendant suffered is clear on the face of this ground. Further, because Dr. Rosa's statements at trial were testimonial hearsay, and a *Crawford* violation, as shown in Ground One (three of §2254), harmless error cannot be attached. It is impossible to believe the jury did not give great weight to Dr. Rosa's testimony.

Moreover, because the record reveals that Nakita was lying and wanted to recant, there can be no reasonable explanation as to why counsel did not pursue a viable defensive strategy. A bunch of "objections" at trial does not make a valid or reasonable defense.

Had counsel made the proper preparations to confront the DNA evidence, Robelto's inconsistent statements, Dr. Rosa's unlawful testimony, and insisted with all the power of the court to confront Nakita Khan at trial, there is a great probability that the Defendant's trial would have resulted in acquittal.

(b)   If you did not exhaust your state remedies on **Ground Four**, explain why: **N/A**

(c)   Direct appeal of **Ground Four**: *Pro se* **pleading is unauthorized in Florida courts as argued in case numbers 4D12-2385, and 4D13-349**

   (1)   If you appealed from the judgment of conviction, did you raise this issue?      Yes ☒ No ☐
   (2)   If you did <u>not</u> raise this issue in your direct appeal, explain why:

   **The issue was not properly preserved for appellate review .**

(d)   **Post-Conviction Proceedings:**
   (1)   Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
               Yes ☒                  No ☐
   (2)   If your answer to Question (d)(1) is "Yes," state:
   Type of motion or petition: **Motion for Post-Conviction Relief pursuant to Fla.R.Crim.P. 3.850**

   Name and location of the court where the motion or petition was filed:   **19th Judicial Circuit in and for St. Lucie County, Florida, P.O. Box 700, Ft. Pierce, FL 34954**

   Docket or case number (if you know): **562002-CF-1166A**
   Date of the court's decision: **April 11, 2007.**
   Result (attach a copy of the court's opinion or order, if available): **Denied, (See, Appendix 1).**
   (3) Did you receive a hearing on your motion or petition?                                    Yes ☒ No ☐
   (4) Did you appeal from the denial of your motion or petition?                            Yes ☒ No ☐
   (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?      Yes ☐ No ☒
   (6) If your answer to Question (d)(4) is "Yes," state:
         Name and location of the court where the motion or petition was filed: **Fourth District Court of Appeal, 1525 Palm Beach Lakes Blvd., West Palm Beach, FL 33401**
         Docket or case number (if you know): **4D08-3124**
         Date of the court's decision: **May 25, 2011.**
         Result (attach a copy of the court's opinion or order, if available): **Denied per curiam affirmed, (See Appendix 2).**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue: **Counsel abandoned the issue on appeal.**

(e)     **Other Remedies:** Describe any other remedies (such as habeas corpus, administrative remedies, etc) that you have used to exhaust your state remedies on **Ground Four: none.**

**GROUND FIVE:** Counsel was ineffective for failing to become familiar with forensic evidence and not presenting an expert testimony, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Florida Constitution.

(a) SUPPORTING FACTS: The State court's denial of this claim was an unreasonable application of clearly established Federal law when the court failed to conduct an evidentiary hearing and or grant the Petitioner an opportunity to amend the claim. When Petitioner stated to wit:

This claim of ineffective assistance of defense counsel, like the grounds encompassed in the Defendant's parent motion (grounds 2-8 of §2254 petition), exceeds the standard of review and is facially and legally sufficient to avoid summary denial.

A do nothing defense strategy is not an acceptable one where counsel engaged in little or no pretrial investigation, presented no witnesses where several where available, failed to depose the victim; specifically in this issue, failed to present expert testimony for the defense and failed to investigate forensic evidence and familiarize himself with the scientific area in which the State was relying. This ground is a colorable and textbook example of deficient legal representation. While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed defendants to gladiators. Counsel's misrepresentation was a serious breach in Defendant's lawful armor.

While it is certainly true the burden of proof is on the State to prove beyond a reasonable doubt the charge against a Defendant, once the State sponsored actors take the stage, a jury must be given an alternative as the drama unfolds. Absent a showing by the defense, a conviction is a foregone conclusion, in effect, making our adversary system of justice a sham.

In the case at bar, counsel's strategy of defense was, "No Victim, No Crime." Counsel mistakenly believed, and told the Defendant many times:

"If Nakita does not come to court and testify, the State cannot prove their case."

An attorney who represented the Defendant prior to trial actually stated this in a letter:
"If the victim is not going to testify then I urge him (the Defendant) to proceed to trial as the State cannot prove the case against him."

What makes this asinine statement even more unbelievable is the paragraph that proceeded the above mentioned sentence states that the laboratory DNA analysis reveals that the Defendant is 99.99% the contributor of the result in question! So it is without any doubt that defense counsel knew the State would center their prosecution around this inculpatory forensic evidence.

The State relied heavily, if not solely on the DNA evidence presented to the Court and jurors by two expert witnesses, Mr. Ritzline, a lab technician, and Dr. Tracy, a population geneticist. The record shows that their DNA testimony went for the most part unopposed, suffering only a perfunctory cross-examination. Not because the testimony was irrefutable, but because counsel failed to familiarize themselves with the science at issue and failed to garner much needed expert defensive help. Had counsel become familiar and/or sought knowledgeable direction, a proper and viable strategy could have been utilized to cast doubt on the State's theory of prosecution. Some of the specific areas that should have been opposed were:

1.      Absence of a *Frye* hearing made the DNA evidence inadmissible. Counsel failed to request one and it is doubtful that they ever had knowledge of what the requirements of forensic evidence entailed.

2.     DNA identification testing had been described by witnesses as foolproof and as unassailable as the law of gravity. However, many serious questions could have been raised concerning reliability and acceptability as evidence in a legal proceeding.

3.     Of critical importance is whether the standards and procedures used by the unlicensed and non-accredited lab in analyzing and comparing the biological samples were appropriate and sufficient to ensure the reliability of its results. This is the Dark Side to DNA and the unexamined witness.

4.     It has been suggested that the proponent of DNA evidence be required to furnish the adversary with copies of laboratory books; reports, including a description of match criteria, band size measurements, and allele frequency calculation methods; a copy of the data pool for each locus examined; statements setting forth observed contaminates, instances of degradation and laboratory errors, together with descriptions of control tests performed to determine their origins and effects; and chain of custody documents. The Defendant was constitutionally entitled to discovery of the data and methodology underlying DNA test results offered against him, so as to permit meaningful cross-examination and independent expert review.

5.     Defendant asked counsel numerous times for independent analysis and review. He was told not to worry about the DNA. A defense expert or an attorney knowledgeable in this forensic science would not have made this error.

6.     Dr. Tracy testified that an individual receives 50% of their DNA from each parent. However, he states that he found "startling" and "unusual," a finding of 80% in testing done by Mr. Ritzline. An expert defense witness would have shown that this 80% was medically and scientifically impossible, rendering the DNA lab test done in this case not trustworthy. Moreover, counsel let this "startling" and "unusual" discrepancy in the State's evidence go unopposed.

7.     Records reveal that Mr. Ritzline was married to the prosecuting attorney in this case. Mr. Ritzline personally obtained the DNA samples from the Defendant for comparison testing. These samples consisted of oral swabs and blood samples. The Defendant at the time did not know a law suit against Ms. Nelson. Had a defense expert been called, to consult or testify, it would have been shown that the oral swab was an accepted practice for obtaining DNA, and that an invasive procedure of drawing blood is not needed, and enhances the risk of testing contamination, either by accident or intentional. Given the obvious error as outlined in paragraph 6, contamination is likely. Again, counsel failed to cast doubt and discredit the State's evidence.

8.     Dr. Tracy testified that he based his calculations on statistical frequency on two databases; "Broward County" and "Trinidadian." It can be shown that Broward County lab was not licensed or accredited at the time of the Defendant's trial. Moreover, the Defendant is of East Indian and Pakistani parentage, making the Trinidadian database immaterial. Further, Dr. Tracy failed to give the jury a statistical number' the all important second step for DNA testimony. This error makes Dr. Tracy's entire testimony legally meaningless. A jury cannot be asked to weigh the DNA evidence without a statistical number. The Florida Supreme Court has made this mandatory in every case dealing with DNA testimony.

## CONCLUSION

There were a host of areas that a knowledgeable attorney or expert in DNA could have used to oppose the State's forensic evidence. Failure to cast doubt or refute this evidence cannot be as strategic play on counsel's part. Moreover, counsel's belief that no victim, no crime, no conviction is inexcusable. The State relied almost exclusively on the DNA testimony of Mr. Ritzline and Dr. Tracy. Therefore, harmless error cannot attach to defense counsel's failure to present expert testimony and familiarize himself with the State's forensic evidence.

The deficiency and prejudice has clearly been shown, supra. Had counsel presented expert testimony and make a knowledgeable cross-examination, there is a reasonable probability that the outcome would have been different.

(b)   If you did not exhaust your state remedies on **Ground Five**, explain why: **A per curiam affirmed opinion cannot proceed further in Florida.**

(c)   **Direct appeal of Ground Five:**
     (1)   If you appealed from the judgment of conviction, did you raise this issue?    Yes ☐  No ☒
     (2)   If you did <u>not</u> raise this issue in your direct appeal, explain why:

**I was represented by an attorney who was at fault.  My attorney omitted the issue and the Court accepted the DNA evidence as overwhelming evidence of guilt and entered a PCA opinion. (See, Appendix 8).**

(d)   **Post-Conviction Proceedings:**
     (1)   Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
           Yes ☒           No ☐

     (2)   If your answer to Question (d) (1) is "Yes," state:
Type of motion or petition: **Amended Motion for Post-Conviction Relief pursuant to Fla.R.Crim.P. 3.850 on the claim of ineffective assistance of counsel.**

Name and location of the court where the motion or petition was filed:  **19th Judicial Circuit in and for St. Lucie County, Florida, P.O. Box 700, Ft. Pierce, FL 34954**

Docket or case number (if you know): **562002-CF-1166A**
Date of the court's decision: **April 11, 2007**
Result (attach a copy of the court's opinion or order, if available): **Denied, (See, Appendix 1)**
(3) Did you receive a hearing on your motion or petition?           Yes ☒ No ☐
(4) Did you appeal from the denial of your motion or petition?      Yes ☒ No ☐
(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal?    Yes ☒ No ☐
(6) If your answer to Question (d) (4) is "Yes," state:
     Name and location of the court where the motion or petition was filed:  **Fourth District Court of Appeal, 1525 Palm Beach Lakes Blvd., West Palm Beach, FL 33401**
     Docket or case number (if you know): **4D08-3124**
     Date of the court's decision: **May 25, 2011**
     Result (attach a copy of the court's opinion or order, if available): **Denied per curiam affirmed, (See Appendix 2).**

(7) If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue:
**N/A**

(e)   **Other Remedies:** Describe any other  remedies (such as habeas corpus, administrative remedies, etc) that you have used to exhaust your state remedies on **Ground Five**:
**A writ of habeas corpus filed on August 2, 2011; refiled on November 21, 2012 and a second amended refiled on March 20, 2013.**

**<u>GROUND SIX</u>: Newly discovered evidence that trial counsel was ineffective when counsel did not investigate the DNA report where there was no Trinidadian database as the DNA report shows using a Trinidadian database.**

**(a) <u>SUPPORTING FACTS</u>:** The State court's summary denial of this claim without first conducting an evidentiary hearing was an unreasonable application of clearly established Federal law as articulated in <u>Strickland v. Washington</u>. When the Petitioner stated to wit:

**Notice: For clarification Petitioner attached the exhibits of this Ground as Appendix 11.**

1.     On August 7, 2002, the DNA expert provided a DAN report which reads as follows:
"Using a Trinidadian database the probability of paternity is 99.999% as compared to an untested, non-related randomly chosen man of the Trinidadian population (prior probability O.5.)"[2]

2.     The prosecuting attorney Kathryn M. Nelson used such DNA report to file an amended charging document on August 8, 2002.

3.     In January of 2003, counsel was appointed as counsel of record to represent Movant. Counsel did not conduct any investigation because he believed that Movant's past attorneys had conducted all investigations. Council proceeded to trial with a "no victim strategy" hoping that trial court would dismiss the charges. At trial, counsel allowed the DNA expert to provide evidence to the trial fact finders without investigating and ascertaining the reliability of the evidence first.

4.     At trial the defense counsel allowed the prosecuting attorney to present her husband as DNA expert who testified and presented the DNA report to the trial fact finders. TT. 506-22.

5.     Counsel further allowed a population geneticist expert to testify before the trial fact finders that he used a (non-existent) Trinidadian database to formulate his opinion. TT. 541-555. He stated as follows:
"After I reviewed all the data and calculated paternity index and probability of paternity values it is my opinion that Roger Khan is the alleged father of that product of conception." TT 546:9-12.

6.     At trial, counsel allowed the prosecutor to present to the trial fact finders as follows:
"... And actually collected part of the aborted fetus or products of conception was sent to our crime laboratory here in Fort Pierce. For DNA testing. For paternity testing. And the purpose of that obviously was to find out who the father of the aborted fetus. ... And Earl Ritzline, who is my husband you all heard that, took an oath to tell the truth, he did the DNA in this case and you can't manipulate the DNA, you can't change the DNA. The DNA is what it is. DNA doesn't lie." TT                                                                                                        631-32
"And the State has proven all of these charges beyond a reasonable doubt by the testimony of all the witnesses, by the DNA, that the Defendant had sex with his own daughter, his own daughter, and got her pregnant, and it really is unbelievable that someone would do that. It really is unbelievable, but he did. DNA does not lie. The Defendant had sex with his daughter and got her pregnant." TT 634:18-24.

7.     The trial fact finders found Movant guily as charged on March 28, 2003. On April 29, 2003, Movant was sentenced to a term of 40 years DOC. Counsel subsequently filed an appeal, which was granted; an oral argument. The judges accepted the DNA evidence as "overwhelming evidence of guilt," and tendered a silent per curiam affirmed opinion. *Khan v. State*, 884 So.2d 946 (Fla. 4th DCA 2004).

8.     Movant requests that this Court take judicial notice that on May 31, 2006, he filed a motion for post-conviction relief raising the precise claim in ground one and eight. Claims of ineffective assistance of trial counsel for not investigating the DNA evidence motion was denied on April 11, 2007, by Judge James Mccann, wherein the judge stated as follows:
"The Defendant has not pointed to any facts that demonstrate the databases or population statistics testimony was not reliable and has therefore failed to establish deficient performance or prejudice on the claims." See Court's Order, p. 5, issued on April 11, 2007.

9.     On or about October 2011, Movant received **newly discovered evidence** that shows that the database and population statistics testimony was not reliable and was false evidence presented to the trial fact finders. Movant adopts the motion that was filed on May 31, 2006, and amended on June 29, 2006, (Grounds 1 and 8) within this newly discovered evidence claim because such evidence in Ex. 5 (of the motion) stated as follows:
"If a national database existed, we would find that our police would suddenly be soling crimes at a respectable rate." See Ex. 5, section 7.

---

[2]Petitioner will omit exhibits from this Petition.

## JUDICIAL NOTICE

Had Movant possessed this information when he filed his first motion, he would have used such in his motion, grounds one and eight, and the trial court would have granted the grounds and ordered a new trial and/or a dismissal of charges because the claims were timely filed.

At trial, such false evidence presented by the State's witnesses prejudiced Movant and denied him a fair trial as mentioned herein. Movant requests that this Court adopt his first motion filed on May 31, 2006, and on June 29, 2006, within this newly discovered evidence claim and revisit ground one and eight and rule upon the merits, pursuant to Fla.R.Crim.P. Rule 3.850(d), (2013).

## ARGUMENT

Movant argues that on April 11, 2007, the trial court denial with conclusion that Movant has not pointed to any facts that demonstrate the database or population statistic testimony was not reliable and has therefore failed to establish deficient performance or prejudice on the claims and denied the motions grounds as a non-final, non-appealable order. Nor did the court grant the Movant the opportunity to amend the grounds pursuant to *Spera v. State*, 971 So.2d 754 (Fla. 2007).

Therefore, this Court should accept this motion as a legal amendment motion, *Spera*, within such newly discovered evidence where Movant received evidence on or about October of 2011 that shows that at the time of Movant's DNA testing and trial testimony of experts there was never a Trinidadian database to compare to an untested, non-related randomly chosen man of the Trinidadian population. See, Ex. 5. As the DNA reports stated in Ex. 6, "using a Trinidadian database." Such evidence is false evidence.

Had trial counsel investigated the DNA evidence concerning a Trinidadian database, he would have found out that there was no Trinidadian database and could have impeached the State's witnesses. Instead, counsel's allowed the prosecutor's witness to present false testimonial evidence before the trial fact finders, such prejudiced Movant before the trial fact finders who later rendered a guilty as charged verdict. Such evidence contradicted the State's witnesses' testimony. Clearly, in light that Movant had, and still claims, his innocence from day one. Toward the DNA evidence Movant argues Ex. 5 which states that "[I]f a Trinidadian database existed, we would find that our police would suddenly be solving crimes at a respectable rate." This statement was issued on July 27, 2011. See Ex. 5.

Had there been a Trinidadian database in existence, the newspaper would not have published this article. The newspaper did not have a personal stake in Movant's trial, as the State's witnesses did have a personal stake where the prosecuting attorney was married to the DNA expert and the population geneticist expert was paid for his false testimony in the amount of $1,200.00.

Had counsel objected and presented Exhibit 5 in a motion to dismiss or a motion for new trial, there is a reasonable probability that but for counsel's unprofessional error by not investigating the State's DNA evidence, had counsel investigated and presented Exhibit 5, the result of the proceeding would have been different at trial and/or on appeal. If counsel had in fact investigated the Trinidadian database and presented investigative evidence during trial to the trial fact finders, Movant would not have been convicted.

Counsel never advised Movant of the evidence and Movant only learned of the evidence on or about October 2011, which could substantiate a newly discovered evidence claim, says *Osborne v. State*, 958 So.2d 1017 (Fla. 5th DCA 2007).

Newly discovered evidence claims cannot be denied as successive, says *Delgado v. State* 743 So.2d 569 (Fla. 3rd DCA 1999).

Acquiring public records and attorney files can lead to discovery of newly discovered evidence and authorize a second motion for post-conviction relief, says *Buenoano v. State*, 708 So.2d 941 (Fla. 1998); *Polk v. State*, 906 So.2d 1212 (Fla. 1st DCA 2005).

Newly discovered evidence was well stated when the Defendant cannot have had a constructive knowledge of police report and material counsel failed to acquire, says *Bailey v. State*, 768 SO.2d 508 (Fla. 2nd DCA 2000). Such newly discovered evidence requires a new trial. *Mordanti v. State*, 894 So.2d 161 (Fla. 2004). Likewise, newly discovered evidence was ascertained at an evidentiary hearing when a witness testified contrary to the victim which would have impeached the State's version as portrayed by the victim. Such a second motion cannot be denied as successive, *Harley v. State*, 854 So.2d 751 (Fla. 4th DCA 2003), where a co-defendant now

admits to lying and Defendant couldn't have gotten him to admit prior, although Defendant had previously claimed he was lying. Such constituted newly discovered evidence claim which would have probably brought about a different verdict. *Burns v. State*, 858 So.2d 1229 (Fla. 1st DCA 2003).

At trial, Movant could not have objected or motioned the court. A pro se pleading is unauthorized in the State of Florida when represented by counsel, and Movant was detained in St. Lucie, County Florida jail and could not have any investigation pro se.

Movant did tell counsel that he was innocent and that something was wrong with the DNA evidence because he did not have sex with the alleged child victim, his daughter. Counsel did not investigate the DNA evidence, therefore, counsel was ineffective. This Court should grant an evidentiary hearing. The State did not reveal to the defense evidence which would have exonerated the Movant as the donor of semen, *Polk*, supra. Had the State revealed such evidence, the result of the proceeding would have been different. A new trial is warranted.

## STANDARD OF REVIEW FOR INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

In order to show a violation of the Sixth Amendment right to counsel, Movant must satisfy the two-pronged inquiry of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 122 S.Ct. 1843, 1850-51, 152 L.Ed.2d 914 (2002).

First, the Movant must demonstrate that the attorney's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the counsel guaranteed the Movant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

1) Movant argues that counsel knew that his client did not have sex with his daughter or get her pregnant; counsel received letters from the alleged child victim stating so; 2) Movant told counsel something was wrong with the DNA testing because he did not have sex with his daughter and his daughter came to Florida from Trinidad; 3) counsel knew that the alleged child victim was not coming back for trial because she was afraid she would get in trouble for lying on the Movant; 4) Movant requested counsel to investigate the DNA evidence. Counsel told him, "no victim, no crime." And that the trial court would grant a judgment of acquittal at the close of the State's case. Again, counsel was wrong.

5) Trial counsel did not object at trial concerning the DNA testimony, nor the presentment of any evidence of the alleged (but non-existent) Trinidadian database, or to the admission of such testimony as the witness Dr. Tracy, who testified that he used the same Trinidadian database Mr. Ritzline used. TT. 541-555. Therefore, Movant met the first prong of *Strickland*.

Second, the Movant must prove prejudice, in that he must show that there is a reasonable probability, that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* 466 U.S. At 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. At 694.

1)       Movant argues had the trial fact finders not heard from Doctor Martin Tracy, population geneticist, stating that:

"after I reviewed all the data and calculated paternity index and probability of paternity values, its my opinion that Roger Khan is the alleged father of that product of conception using a Trinidadian database." TT 546:9-12.

2)       And had the trial fact finders not heard from the prosecuting attorney that "DNA does not lie" and that her husband, Mr. Ritzline, like the other witnesses, "took an oath to tell the truth, he did the DNA testing in this case and you can't manipulate the DNA, you can't change the DNA, DNA is what it is, DNA doesn't lie." TT. 631-634, there is a reasonable probability that but for counsel's unprofessional error not investigating, not objecting concerning such false evidence, the outcome would have been different.

3)       Had counsel investigated the Trinidadian database, that was in the DNA report, he would have found there was no Trinidadian database, as evidenced in Exhibit 5. Had counsel presented to the trial fact finder that there was no Trinidadian database as the State's witness portrayed, there is a reasonable probability that the reuslt of the proceeding would have been different at trial and/or on appeal. *Id.* At 466 U.S. At 694. A reasonable probability is a probability sufficient to undermine the confidence in the outcome. *Strickland*.

Movant further argues that counsel was not the counsel that is guaranteed by the United States Constitution. Counsel cannot be shielded by this court for failure to investigate the alleged Trinidadian database used in the DNA report in Exhibit 6. At an evidentiary hearing, this court should not allow counsel to raise this as a defense purporting trial strategy or tactic. *Crisp v. Duckworth*, 743 So.2d 580, 584 (7th Cir. 1984). The failure to investigate is not trial strategy. *Kenley v. Armentrout*, 937 F.2d 1298, 1364 (8th Cir. 1991).

Further, the decision not to present evidence and witnesses can never be strategy where counsel never investigated them first. *Heiney v. State*, 620 So.2d 171, 173 (Fla. 1993). Counsel did not attempt to develop a case concerning the DNA evidence. *Hardwick v. Crosby*, 320 F.3d 1127, 1186 N. 208 (11th Cir. 2003).

Therefore, this Court should hold counsel ineffective and grant a second evidentiary hearing due to the newly discovered evidence received on or about October 2011 in Exhibit 5, where the evidence is sufficient to warrant an evidentiary hearing. *McGuffey v. State*, 515 So.2d 1057 (Fla. 4th DCA 1987), because on August 8, 2002, the State amended the information with the DNA report, and this DNA report evidence was false. *Meek v. State*, 801 So.2d 287 (Fla. 4th DCA 2001).

In order to establish the trustworthy accounts of the alleged critical evidence that was not presented at trial before the trial fact finders. *Schlup v. Delo*, 513 U.S. 298 at 324, 115 S.Ct. 851 at 865, 130 L.Ed.2d 808 (1995).

Had the Movant known of the evidence, he would have told counsel that there was no Trinidadian database as was portrayed by the State's witnesses at trial; Movant only gained knowledge of this fact in 2011 when he received the evidence from a newspaper article sent to him by his sister Ada Luz Daniel.

Therefore, this Court cannot deny the newly discovered evidence claim as the court stated in *Down v. State*, 740 SO.2d 506 (Fla. 1999); *Walker v. State*, 928 So.2d 407 (Fla. 3rd DCA 2006), because m' did not have any knowledge of Trinidadian database (or lack thereof) until he serendipitously discovered the evidence in 2011 ( Movant is a foreign national and did not learn to read and write English until 2007).

At trial, Movant could not have objected or motioned the court pro se, pro se pleading is unauthorized in the State of Florida. Movant was detained in St. Lucie County, Florida jail and could not have done any investigation pro se and it was counsel's duty to present all evidence, motions/objections/arguments before the court and had counsel investigated and presented such evidence the outcome would have been different. The Movant has met the prongs of *Strickland*.

(b)      If you did not exhaust your state remedies on **Ground Six**, explain why: **I was sanctioned and prohibited from filing a pro se notice of appeal within the Fourth District Court of Appeal in Case No: 4D14-2143. (See Appendix 7). Further, I could not afford to pay an attorney to appeal the issue. The attorney I contacted required $20,000 in order to represent me in the appeal. (See Appendix 9).**

(c)      **Direct appeal of Ground Six:**

(1)      If you appealed from the judgment of conviction, did you raise this issue?      Yes ☐  No ☒

(2)      If you did <u>not</u> raise this issue in your direct appeal, explain why: **I was represented by an attorney who failed to discover the evidence and had the evidence been discovered and presented to the Fourth DCA, the panel would not have considered the DNA evidence as overwhelming evidence of guilt. (See Appendix 8)**

(d)      **Post-Conviction Proceedings:**

(1)      Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ☒                    No ☐

(2)      If your answer to Question (d) (1) is "Yes," state:

Type of motion or petition: **Post conviction relief 3.850(b)(1)**

Name and location of the court where the motion or petition was filed: **19th Judicial Circuit in and for St. Lucie County, Florida, P.O. Box 700, Ft. Pierce, FL 34954**

Docket or case number (if you know): **562002-CF-1166A**

Date of the court's decision: **June 16, 2015 and July 14, 2015**

Result (attach a copy of the court's opinion or order, if available):  **Denied, (See, Appendix 4).**
(3) Did you receive a hearing on your motion or petition?                                Yes ☐ No ☒
(4) Did you appeal from the denial of your motion or petition?                           Yes ☐ No ☒
(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal?  Yes ☐ No ☒
(6) If your answer to Question (d) (4) is "Yes," state:
      Name and location of the court where the motion or petition was filed:
      Docket or case number (if you know):  **N/A**
      Date of the court's decision:  **N/A**
      Result (attach a copy of the court's opinion or order, if available):

(7)    If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this  issue:  **I was sanctioned and prohibited from filing pro se notice of appeal unless it was signed by an attorney and I could not get an attorney to do it unless I had $20,000.00 to pay an attorney.**

(e)    **Other Remedies:** Describe any other  remedies (such as habeas corpus, administrative remedies, etc) that you have used to exhaust your state remedies on **Ground Six: I initially filed a Petition for Writ of Habeas Corpus within the trial court on August 2, 2011 on the claim of newly discovered evidence which was dismissed and refiled on November 21, 2012. The Petition refiled/amended on March 20, 2013.**

**GROUND SEVEN: The previous DNA testing was inconclusive for it lacked a Trinidadian database which includes East Indian / South Asian population persons.**
**(a) SUPPORTING FACTS**: The State court's denial of this claim was an unreasonable application of clearly established Federal law when Petitioner's right to substantial due process to have a second DNA test conducted. When Petitioner stated to wit:
**Notice: For clarification Petitioner attached the exhibits of this Ground as Appendix 12.**
    On June 19, 2013, Petitioner filed a motion for post-conviction new DNA testing pursuant to Fla.R.Crim.P. 3.853(b) as follows:
      Mr. Khan states under the penalty of perjury that all matters alleged herein are true and correct in accordance with Fla.R.Crim.P. 3.853(b).[3]
*Pursuant to Fla.R.Crim.P. 3.853(b)(1) Standard of Review*
A.    Statement of the facts relied upon in support of the motion: Mr. Khan states that the State's expert Mr. Earl L. Ritzline the DNA expert and the population geneticist expert, Dr. Martin Tracy, did not use an East Indian South Asian Trinidadian database to determine combined paternity index,[4] but used an African-Trinidadian database and Mr. Khan, the alleged child victim and Mr. Khan's grand child all are from the East Indian ancestry, *Id.* TT. 550 (See Exhibit 1).
B.    Description of the Physical Evidence Containing DNA to be tested: Mr. Khan claims that the evidence contains DNA material to be tested is the aborted fetus (Products of conception) received on May 24, 2002; Nakita Khan's sexual assault kit w/oral swabs received on May 30, 2002; Roger Khan' blood specimens received on June 21, 2002; and Robelto Khan's swab and saliva samples received on October 2, 2002..
C.    The Present location of the Evidence: Mr. Khan states that the present location is at the Indian River Community College, at 3209 Virginia Ave, Ft. Pierce, FL 34981, case number 2002-0524-1363. Such evidence was delivered by the Port St. Lucie Police Department, agency case number 3-02-004956.
*Pursuant to Fla.R.Crim.P. 3.853(b)(2) Standard of Review*
A.    Statement that the evidence was not previously tested for DNA, or a statement that the result of the previous DNA testing was inconclusive.    Mr. Khan states that the previous DNA

---

[3] Petitioner has omitted the procedural history and the contents of the motion within the instant petition.
[4] Mr. Khan and his biological daughter, the alleged child victim, is of East Indian, South Asian ancestry living with Trinidad and Tobago population, which is 40% of the population of Trinidad and Tobago.

testing was inconclusive because it was conducted without using an East Indian South Asian Trinidadian database, or Broward County South Asian database as the expert said, "obviously you use a different database, you get a slightly different answer." *Id.* TT 550 lns. 7-15. Therefore, the previous DNA testing was inconclusive.

B.      That subsequent scientific development in DNA testing techniques likely would produce a definitive result establishing that the Movant is not the person who committed the crime. Mr. Khan states that new scientific development in Trinidad and Tobago in DNA testing would produce a definitive result, where Trinidad and Tobago has now developed a Trinidadian database which includes East Indian South Asian Trinidadian heritage. Such new DNA testing would produce a definitive result establishing that Mr. Khan is not the person who committed the crime, in count (3) – child abuse – impregnating a minor. (See Exhibit 2).

*Pursuant to Fla.R.Crim.P. 3.853(b)(3) Standard of Review*

Statement that the Movant is innocent:

A.      Mr. Khan states that he is innocent of the crime charged, child abuse – impregnating a minor in count (3), where the alleged child victim came into the State of Florida on December 17, 2001, pregnant from Trinidad and Tobago and when aborted on May 22, 2002, the fetus was five months and three weeks old.

B.      Mr. Khan states that new DNA testing using an East Indian South Asian Trinidadian database will exonerate him of being the biological father of the aborted fetus, for which he was sentence in count (3), and such DNA testing would mitigate the sentence received on April 29, 2003, for the crime in count (3).

*Pursuant to Fla.R.Crim.P. 3.853(b)(4) Standard of Review*

Statement that identification of the Movant is a genuinely disputed issue in the case.

A.      Mr. Khan states that he has always claimed his innocence from day one upon this date and time and the previous DNA testing was conducted without using the East Indian South Asian Trinidadian database where the population geneticist used only an African-Trinidadian database and a Broward County database, which includes Caucasians, African Americans, and Hispanic population. *Id.* TT. 550. Therefore identification is a genuinely disputed issue.

        At trial, the alleged child victim refused to testify in person and she testified through letters stating that she lied about the allegation and through a witness, Ms. Ada Luce Daniel that she had lied about the allegations and at trial the prosecuting attorney testify that the alleged child victim was having sex with a boy, (*Id.* TT. 176, lines 17-21), who was not tested for DNA paternity testing who was also of the East Indian nationality. At trial, Ms. Ada-Luze Daniel testified that the fetus was over five months old when it was aborted on May 22, 2002 (*Id.* TT. 575-577); at trial the DNA expert testified that he was married to the prosecuting attorney and that the laboratory was not licensed or accredited. Identification is a genuinely disputed issue where the expert had a personal stake in the outcome of his DNA testing.

B.      Mr. Khan states that if this Court grants new DNA testing, the new testing would exonerate him of being the biological father of the aborted fetus and such would cause the Court to mitigate the sentence received on April 29, 2003.

*Pursuant to Fla.R.Crim.P. 3.853(b)(5) Standard of Review*

Statement of any other facts relevant to the motion:

R1.     Foremost, Mr. Khan states that he is innocent and has been wrongly convicted of the crime charged due to the DNA evidence.

R2.     On December 17, 2001, the alleged child victim entered the State of Florida, pregnant from Trinidad and Tobago,[5] "the DNA Material Evidence."

---

[5] Therefore, the trial court lacked jurisdiction over the pregnancy DNA material. *Waggy v. State*, 935 So.2d 511 (Fla. 1st DCA 2006); *Sanders v. State*, 37 Fla.L.Weekly D.225 (Fla. 4th DCA 2012).

On March 1, 2002, while visiting a friend's home in St. Lucie County, Florida, Mr. Khan caught his biological daughter having sex with his friend's son who was also East Indian ancestry and Mr. Khan disciplined her for such misconduct. *Id.* TT. 176 Lines 17-21.

On March 31, Mr. Khan requested his live-in girlfriend Marrie Muller to conduct a home pregnancy test on his biological daughter. Such yielded positive at such time his daughter stated, "Daddy I'm pregnant from a boy in Trinidad." With such confession I got upset and I did spank and discipline my daughter and I grounded her. On Sunday night, March 31, 2002, I was talking to my daughter and I told her that she is "like her mother, hot in the pants," and she stated she hated me. I then started to spank her for the disrespectful words. Robelto Khan, my son, got up from sleeping and told me, "Daddy stop, you would kill her." I stopped. *Id.* in the Police Report.

On April 1, 2002, Monday morning, my daughter ran away from home, thereafter she went to the Port St. Lucie Police Department and made a statement that I beat her and rape her and on April 2, 2002, the State Attorney's office prosecuting attorney took my biological daughter to a doctor's office for a medical examination without a court order or any legal consent.

The child victim told the doctor she was having voluntary sex with a 15 year old male and that the father (me) learned of this episode and hit her with a belt for being pregnant and having sex with a boy. (*Id.* Dr. Rosa Report), and on April 11, 2002, the State Prosecuting Attorney filed charges, by way of an information, charging me with sexual battery on a child-familial or custodial authority. §794.011(8)(b).

R3.     On May 22, 2002, the State ordered the alleged child victim to undergo an abortion, without a Court order[6] and without any evidence that I fathered my daughter's baby. On May 26, 2002, the child victim was sent back to Trinidad and Tobago by the state prosecutor because her Visa was about to expire where the Visa was only for six months.

On June 13, 2002, the prosecuting filed a petition to the trial court, requesting the Court to compel me to submit my blood samples to the prosecutor's husband for DNA testing. On June 21, 2002, the DNA expert came to the county jail, and compelled me to allow him to withdraw my blood and my saliva samples. I submitted myself because of the compelling order from the Court not knowing that it was the prosecuting attorney's husband who was samples and the person who was about to do the DNA testing in the case and had I known of the conflict I would have refused to submit myself for the blood withdrawal and I would have requested another DNA expert to perform the DNA testing.

R4.     On August 7, 2002, my attorney came to the county jail with a DNA report[7] and told me that I am guilty because of the DNA report. I requested a second DNA testing, such was denied by my attorney. I told counsel if the DNA test shows that I fathered my daughter's baby my son may be the father because they sleep on the same bed together and that is why maybe the DNA test is wrong. I also told her my daughter came to Florida pregnant. Counsel stated that she would look into the matter. See Exhibit 3.

Thereafter, on August 8, 2002, the State filed an amended information using a false DNA report, charging me with two more crimes: incest and child abuse – impregnating a minor. Thereafter, my attorney advised the prosecutor what I told her about my son and the conception of the fetus being conceived in Trinidad and Tobago and on October 2, 2002, the prosecutor requested my son's saliva sent to her office in order to perform a DNA test on him thereafter my attorney withdrew as counsel of record.

R5.     On January of 2003, the Court appoint me an attorney, who I advised that something was wrong with the DNA evidence, and I told him I was talking to the child victim over the phone and she told him she will not come back for trial and that the fetus was a boy and it was five months and three weeks old. Counsel advised me, "Well we should set the case for speedy trial,

---

[6] Tampering with the physical evidence by killing the fetus in violation of §918.13(1), Fla. Stat. (2002).

[7] This DNA report was false (Fake) created by the prosecuting attorney's husband, where such DNA report stated using a Trinidadian database (See Exhibit 5). Trinidad and Tobago had no Trinidadian database at that time (See Exhibit 6) and therefore the DNA Report was fake, similar to Exhibit 4.

no victim, no crime." I asked counsel "what about the DNA evidence?" Counsel stated, again, "no victim, no crime," and that the State would not be able to proceed without the child victim. Thereafter, I agreed to proceed to speedy trial through counsel's advise.

R6.     At trial, counsel allowed three biased jurors to become jury (*Id.* TT 101-116) and did allow the prosecutor to inform the jury that the child victim had an abortion and such fetus was tested for DNA paternity testing and that I fathered my daughter's baby.[8] (*Id.* TT 631-34).

At trial the prosecutor's husband testified that he conducted the DNA testing in the case and he did so in a laboratory that was not licensed nor was it accredited by the AABB. He testified that after he determined paternity DNA testing on August 7, 2002,[9] he did further DNA testing paternity DNA testing of my son, Robelto Khan, in which he received the sample on October 2, 2002, and my son is East Indian ancestry as well. *Id.* TT. 497-501. However, the DNA expert never sent his second testing to the population geneticist expert for review where at trial the population geneticist Dr. Martin Tracy testified that he received the DNA report and all documents from the crime laboratory on August 7, 2002 (*Id.* TT. 541-543) and he reviewed the genetic data from those documents sent to him and that he could not exclude me from being the father of the aborted fetus, (*Id.* TT. 551 lines 19-24), without him having to review my son Robelto Khan's DNA testing as alleged by the prosecutor's husband the DNA expert, the prosecutor's husband (*Id.* TT. 497-501) for paternity to exclude me or us from being the biological father of the fetus to resolve the case. (*Id.* TT. 535-552). And, had Dr. Tracy afforded the opportunity to review Robelto Khan's DNA testing and to compare the testing with the fetus, the outcome would have been different where the doctor would have determined that I was not the biological father of the fetus, but the grandfather. Yes, identification is a genuinely disputed issue in the case.

R7.     Mr. Khan states that had the population geneticist Dr. Tracy reviewed and tested Robelto Khan, my biological son, for paternity of the aborted fetus, he would have excluded me of being the biological father of the aborted fetus and would have proved otherwise. *Id.* TT. 551, lines 19-24 where it has been said; paternity analysis in cases of father-daughter incest using multianelic loci, the probability of exclusion is zero. See Ex. 7.

Therefore, new DNA testing is warranted using an East Indian South Asian Trinidadian database. As Dr. Tracy testified, "that obviously you use a different database you get a slightly different answer." *Id.* TT. 550, lines 7-15. Such new Trinidadian database would prove Mr. Khan's innocence using the East Indian Trinidadian database.

R8.     At trial Robelto Khan had a personal stake in the proceeding where he lied in open court stating "I confessed to him that I had sex with his sister," the alleged child victim, my biological daughter, as the record shows, Mr. Khan received a sworn affidavit on October 2, 2012 from Robelto Khan recanting his trial testimony stating that the prosecutor made suggestive/coercive testimony to him.[10]

Therefore, this Court should grant new DNA testing for the reasons stated herein for the experts not using an East Indian South Asian Trinidadian database when the child victim, the fetus, and Mr. Khan all are of East Indian ancestry. Such new DNA testing would cause this Court to grant an acquittal and had the Movant been afforded such DNA testing by his attorneys there is a reasonable probability that the Movant would have been acquitted and/or would have received a lesser sentence if that second DNA testing had been admitted at trial and the outcome would have been different.

---

[8] The Prosecutor was in fact seeking passions of the jurors presenting irrelevant matters which improperly tend to reflect adversely on Mr. Khan's character, which destroyed the Juror's impartiality. *Cook v. State*, 503 S.E.2d 40 (GA. App. 1998); *Stephenson v. State*, 31 So.2d 847 (2010) *Id.* **TT. 101-116.**

[9] Mr. Ritzline used the same Trinidadian database. *Id.* TT. 543, lines 16-21 See Ex. 5 and Mr. Ritzline was not a population geneticist expert, says *Miles v. State*, 694 So.2d 151 (Fla. 4th DCA 1997); *Hudson v. State*, 820 So.2d 1070 (Fla. 5th DCA 2002).

[10] Such motion was filed on March 20, 2013 on the claim of newly discovered evidence.

R9.     Movant states that the evidence containing DNA is authentic and would be admissible at a further hearing / trial and would show that Mr. Khan is the biological grandfather of the fetus (the evidence to be retested is the aborted fetus; Nakita Khan's samples, Robelto Khan's samples, and Roger Khan' samples), such new DNA testing using the East Indian population geneticist would show Mr. Khan's innocence and would show that the fetus was five months and three weeks old when it was aborted on May 22, 2002 causing the State of Florida to lack jurisdiction over such DNA material evidence when it was conceived in Trinidad and Tobago, not in the State of Florida.

(b)     If you did not exhaust your state remedies on **Ground Seven**, explain why: **N/A**

(c)     **Direct appeal of Ground Seven:**

    (1)     If you appealed from the judgment of conviction, did you raise this issue?     Yes ☐ No ☒

    (2)     If you did <u>not</u> raise this issue in your direct appeal, explain why: **The issue was not discovered at that time.**

(d)     **Post-Conviction Proceedings:**

    (1)     Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        Yes ☒               No ☐

    (2)     If your answer to Question (d) (1) is "Yes," state:

Type of motion or petition: **Motion for New DNA Testing pursuant to Florida Rule 3.853.**

Name and location of the court where the motion or petition was filed:     **19th Judicial Circuit in and for St. Lucie County, Florida, P.O. Box 700, Ft. Pierce, FL 34954**

Docket or case number (if you know): **562002-CF-1166A**

Date of the court's decision: **April 11, 2014**

Result (attach a copy of the court's opinion or order, if available): **Denied, See, Appendix 5).**

(3) Did you receive a hearing on your motion or petition?     Yes ☐ No ☒

(4) Did you appeal from the denial of your motion or petition?     Yes ☒ No ☐

(5) If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal?     Yes ☒ No ☐

(6) If your answer to Question (d) (4) is "Yes," state:

    Name and location of the court where the motion or petition was filed:  **Fourth District Court of Appeal, 1525 Palm Beach Lakes Blvd., West Palm Beach, FL 33401**

    Docket or case number (if you know): **4D14-2597**

    Date of the court's decision:  **August 21, 2014**

    Result (attach a copy of the court's opinion or order, if available):  **Denied per curiam affirmed, (See Appendix 6).**

    (7)     If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue:   **N/A**

(e)     **Other Remedies:** Describe any other remedies (such as habeas corpus, administrative remedies, etc) that you have used to exhaust your state remedies on **Ground Seven: I first filed the issue on September 21, 2011 and on May 15, 2012 the trial court dismissed it without prejudice. I refiled it on June 19, 2013.**

## GROUND EIGHT:

**Newly Discovered Evidence that was willfully withheld by the State in violation of the 5th, 6th, 8th and 14th amendment rights under both the United States and Florida Constitutions, the right to have a fair and impartial trial by the State which warranted a new trial.**

(a)     Supporting facts: The State court unreasonably applied clearly established Federal law by rejecting Petitioner's claim of newly discovered evidence without first conducting an evidentiary hearing and/or refuting the claim. When Petitioner stated to wit:

**Notice: For clarification Petitioner attached the exhibits of this Ground as Appendix 13.**

Mr. Khan states that he received newly discovered evidence from the Indian River Crime Laboratory on September 8, 2014 that included four photographs that reveals what seems to be solely fluid material which identified within as "amniotic sac fluid, and tissues of the expulsion of the alleged child victim's placenta," (See Exhibit 1) contrary to the DNA expert Mr. Ritzline's pre-trial and trial testimony that he received into his laboratory "products of conception, aborted fetus" on May 24, 2002. (T.T. 487-493, 525). Such evidence, the photographs, was willfully withheld by the State prior to trial, during trial and throughout all post-conviction proceedings. *Mordenti v. State*, 894 So.2d 1161 (Fla. 2004). There should be no question, other than granting an evidentiary hearing at this time, due to the fact the newly discovered evidence would have assisted trial counsel, Mr. Edward J. Abare, Fla. Bar No. 874590 in the impeachment of the DNA expert, Mr. Earl L. Ritzline. Mr. Ritzline was the State's only critical witness and was married to the prosecuting attorney, Ms. Kathryn M. Nelson Fla. Bar No. 402478. Both persons had a personal stake in the outcome of the DNA finding/ trial testimony which denied Mr. Khan a fair and impartial trial.

**First Requirement: under *Jones* 1, 2, and 3; *Swafford v. State*, 125 So.3d 760 (Fla. 2013). The evidence must not have been known by the trial court, the party, on counsel at the time of trial and it must appear that the defendant or defense counsel could not have known of it by the use of diligence.**

A1      The Honorable trial court judge Dwight L. Geiger: Judge Geiger had no knowledge that the State had withheld favorable evidence from the defense. Judge Geiger has no knowledge of the newly discovered evidence in Exhibit 1, 13 pages of evidence. At trial, Judge Geiger had no knowledge that the State prosecuting attorney Ms. Kathryn M. Nelson was allowing her husband the DNA expert, Mr. Earl Ritzline, to misrepresent the actual physical evidence he received and tested for paternity DNA testing.[11] In fact, on June 13, 2002, prior to trial, the prosecutor told the judge, Dwight M. Geiger, in open court that the Indian River Crime Lab received the products of conception. See, Exhibit 12, p. 2-3.

A2      Ex parte communication is absolutely unauthorized in all Florida Courts. This is a Right. The prosecuting attorney Ms. Kathryn M. Nelson had a personal stake in the non-disclosure of the favorable evidence in order to avoid the impeachment of her husband, the DNA expert Mr. Ritzline at trial.

A3      The prosecutor is well-educated and has prosecuted many "sex crime" trials in St. Lucie County, Florida Criminal Division. She knowingly withheld the evidence from becoming part of the court record in order to avoid a judgment of acquittal by the trial court. One must remember, had judge Geiger known of the evidence in Exhibit 1, pp. 3-4 and 11, he would not have considered the DNA expert testimony as overwhelming evidence of guilt over a decade ago and he would not have denied counsel's motion for judgment of acquittal (TT. 608-611).

A4      Had the State disclosed the evidence to Judge Geiger during trial, there is a reasonable probability that Judge Geiger would have granted a judgment of acquittal on Count Three due to the fact Judge Geiger denied the judgment of acquittal, stating:
"[T]here is also a medical opinion that one cannot become pregnant or that this child did not become pregnant without intercourse, there is evidence that Mr. Khan is the father of this fetus,"
The Movant would have received a lesser sentence. *Jones* I. Had Judge Geiger had knowledge of the newly discovered evidence in Mr. Khan's post-conviction proceedings, Judge Geiger would not have denied the biased juror issue on July 18, 2008 (presented in Mr. Khan's first Fla.R.Crim.P. 3.850 motion for post-conviction relief filed on May 31, 2006), because Judge

---

[11] *T.M.H. v. T.M.T.*, 79 So.3d 806 (Fla. 5th DCA 2011) provides the definition of "Products of Conception." it is not fluid, it is the actual fetus. *Ob Gyn v. Ana Mejia and Rodolfo-Santana*, 39 Fla.L.Weekly D110 (Fla. 4th DCA January 8, 2014). Also see Exhibit 10 and 19 which show a photograph of a fetus. See Exhibit 10 and 19.

Geiger denied the biased juror issue based upon the DNA expert trial testimony, claiming the evidence was "overwhelming evidence of guilt."

A5      As to Mr. Khan himself, Mr. Khan had no knowledge that the DNA material was not the actual physical aborted fetus tested for paternity DNA testing, because the State prosecuting attorney Ms. Kathryn M. Nelson willfully and as a tactical strategy did not disclose it to pretrial counsel, Ms. Karen J. Tufte, Fla. Bar No. 0998151, in order to avoid a dismissal due to the destruction of favorable evidence under *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

A5      Pretrial counsel Ms. Karen J. Tufte conducted a deposition on September 11, 2002 with Mr. Ritzline, the prosecutor's husband the DNA expert along with the prosecuting attorney Ms. Kathryn M. Nelson, and Mr. Ritzline testified therein that he tested the actual aborted fetus, a foot of the fetus. See Exhibit 2, Deposition Transcripts, p. 7.

A6      Had the State disclosed the 13 pages of evidence to counsel Ms. Karen J. Tufte (Exhibit 1, pp. 3-4, and 11) and Ms. Karen J. Tufte told Mr. Khan that the evidence tested for paternity DNA testing was not the actual physical aborted fetus on August 8, 2002, he would have requested that a motion to dismiss should be filed forthwith under *Youngblood*. Counsel told Mr. Khan that the aborted fetus was destroyed after the paternity DNA testing was concluded. See, Exhibit 3, pp. 16-17, transcript of pretrial hearing. Had counsel not filed a motion to dismiss due to the destruction of physical evidence, Mr. Khan would have informed new counsel Mr. Jeffrey Goodman Fla. Bar No. 102393, to file motion to dismiss all charges. Had he refused to file such motion to dismiss, Mr. Khan would have requested his final counsel, Mr. Patrick McCrae, Fla. Bar 0565725, to file a motion to dismiss all counts, including Count Three prior to trial due to the destruction of evidence and the outcome of the trial would have been different. Had the trial court denied the motion, the issue would have been preserved for appellate review and the outcome would have been different.

A7      The State provided Ms. Tufte with the DNA report and an attached document on August 7, 2002 claiming the DNA material tested for paternity DNA testing was the products of conception, "fetus." See Exhibit 4. Mr. Khan asserts that his paid attorney, Ms. Karen J. Tufte, wholeheartedly believed that the State had actually collected the aborted fetus on May 21, 2002 and that the State had conducted a paternity DNA testing using that aborted fetus and it was destroyed thereafter. See Exhibit 3, pp. 16:16-17, pretrial transcripts.

A8      Ms. Karen J. Tufte did not know that the evidence actually collected was "fluid material" (See Exhibit 2, Deposition Transcripts, p. 7). Further, Ms. Tufte was unaware that the prosecutor's husband was the DNA expert, nor did she know that the laboratory was not licensed or accredited by the AABB. Counsel wholeheartedly believed that the Indian River Crime Lab was an independent facility. See, Exhibit 5. Had Ms. Karen J. Tufte had such knowledge, she would have filed a motion to dismiss prior to the DNA result being issued on August 7, 2002 or soon thereafter, and the outcome of the trial proceedings would have been different.

A9      Mr. Khan requested defense counsel Mr. Jeffrey Goodman Fla. Bar No. 102393 to file a motion for a second DNA testing of the aborted fetus for the defense. See Exhibit 3, *Id.* p. 16 in open court. Mr. Goodman informed Mr. Khan in the elevator room, "bathroom," that the laboratory had destroyed the evidence after the DNA test was conducted by accident because the freezer stopped worked on one weekend and there cannot be any further DNA testing, as Mr. Khan testified to at sentencing through trial counsel Mr. McCrae. (T.T., 672-676). In fact, Mr. Goodman was representing Mr. Khan on June 13, 2002, when the State filed a motion for the court to compel Mr. Khan's blood samples. See Exhibit 12.

A10      On November 13, 2002, Mr. Khan appeared in open court and meet with a new attorney Mr. Edward J. Abare Fla. Bar No. 874590. Mr. Khan informed Mr. Abare what counsel Ms. Tufte and Mr. Goodman told him about the destruction of the aborted fetus after the DNA testing was concluded. Mr. Abare said that the information was not true; that the State cannot destroy the aborted fetus and not file that information within the record and the record does not

support my assertion. On December 4, 2002, Mr. Khan saw counsel Mr. Abare in open court where counsel informed Mr. Khan "not to worry" because he was still investigating the case and would request a second DNA testing of the aborted fetus (such never took place).

A11    In January 2003, Mr. Khan met with his final trial attorney, Mr. Patrick McCrae, Fla. Bar No. 0565725, who stated that he was attorney of record. Mr. Khan told him what Ms Tufte and Mr. Goodman told him regarding the aborted fetus being destroyed. Therein, counsel Mr. McCrae told Mr. Khan that he had no knowledge about his case and he did not see any motion for new DNA testing filed by counsel Mr. Abare and he needed Mr. Khan to enlighten him about the case and the victim. Mr. Khan told counsel that he was sure that the alleged child victim would not come back to Florida and she would not testify against him if the case went to trial. Counsel stated "not to worry yourself," "No victim, no case," and that the State would not be able to prove the charges without the alleged child victim testifying in open court as Mr. Khan testified through counsel on April 29, 2003 (T.T. 672-676) and as counsel argued in open court seeking a dismissal of all charges. (T.T. 367-388). See, Counsel's letter to the Fla. Bar., Exhibit 11.

A12    At trial, the DNA expert testified under oath that he collected the products of conception, a fetus, on May 24, 2002 and it was still on ice and he cut tissues from the aborted fetus (T.T. 487-488, and 525:16-17). He testified that there was an anomaly in the DNA from the products of conception that the Movant also possessed but that the victim did not (T.T. 515), and that the Movant was not excluded from being the father of the fetus (T.T. 516-517). Trial counsel sought a judgment of acquittal and the trial court accepted the DNA expert's trial testimony as overwhelming evidence of guilt as to Counts 1, 2 and 3 (T.T. 608-611). The jury rendered a verdict of guilty as to call counts.

A13    Had Mr. Khan known that the evidence was not the actual physical aborted fetus received for DNA testing, he himself would have objected. Mr. Khan would have informed the trial court that the DNA expert was lying to his jury and he would not have filed a motion to preserve the actual physical aborted fetus on January 4, 2005.

A13    Mr. Khan would have timely filed a motion for post-conviction relief raising the claim of ineffective assistance of counsel for not filing a motion to dismiss Count Three based on the destruction of evidence prior to any paternity DNA testing conducted,

A14    In fact, on April 29, 2003, trial counsel Mr. McCrae told Mr. Khan if the appeal fails, that he should file a motion to have the State preserve the aborted fetus and the (aborted fetus) that was at the Indian River Crime Lab as the DNA expert testified to at trial. "It was left at the laboratory inside the freezer." TT. 501-502.

A15    On January 4, 2005 after the appellate court concluded its per curiam affirmed opinion, Mr. Khan in good faith filed a motion to the trial court requesting the court to compel the State to preserve the DNA evidence (aborted fetus) for further paternity DNA testing. Due to the DNA expert's trial testimony that the evidence was "left in the freezer at the laboratory."

A16    On June 19, 2013, Mr. Khan filed a motion for post-conviction new DNA testing pursuant to Fla.R.Crim.P. 3.853 and on April 11, 2014, the trial court denied the motion on the assumption that the evidence had been destroyed after trial and is no longer in existence (See Exhibit 6, p. 5), not knowing that the DNA material was only fluid material (TT. 350:22-25) that still exists at the Police Department in and for St. Lucie County, Florida. See Exhibit 7. Mr. Khan did not know that the evidence was never the actual physical products of conception, an aborted fetus,[12] as testified to by Mr. Ritzline at trial (T.T. 486-493, and 525:16-17), until he received the actual photographs on September 8, 2014, showing such fact. See Exhibit 1.

---

[12] *T.M.H. v. T.M.T.*, 79 So.3d 806 (Fla. 5th DCA 2011) provides the definition of "Products of Conception," it is not fluid, it is the actual fetus. *Ob/Gyn v. Ana Mejia and Rodolfo Santana*, 39 Fla.L.Weekly D110 (Fla. 4th DCA January 8, 2014). Also see Exhibit 10 and 19 which show a photograph of a fetus. See Exhibit 10 and 19.

A17     Mr. Khan had absolutely no knowledge of the State's non-disclosure of the photographs and the written document in evidence in Exhibit 1 (Exhibit 1, pp. 3-4, 11), 13 pages of evidence. Had Mr. Khan known of the photographic evidence prior to trial, he would have raised the claims within his first motion and he would not have filed a motion on January 4, 2005 to the trial court to preserve the aborted fetus for further DNA testing and would not have filed a motion on June 19, 2013 seeking new DNA testing on the actual physical aborted fetus, nor would have he sought new DNA testing throughout the years in regard of the actual physical aborted fetus. See Exhibits 8, 9 & 15.

A18     Even Ms. Linda C. Craft, the Assistant State Attorney over all post-conviction proceedings believed that the products of conception were paternity DNA tested. (See, letter from Ms. Craft dated 8/11/2014, Exhibit 13).

A19     As to trial counsel Mr. Abare and Mr. McCrae, both diligently sought *Brady* material prior to trial. The State failed to supply trial counsel with the 13 pages of evidence. In fact, at trial, the State prosecuting attorney Ms. Kathryn M. Nelson only gave trial counsel and the court one of the 13 pages of evidence, State's Exhibit 5, T.T. 460 see Exhibit 14 and withheld 12 pages of evidence that would have assisted trial counsel Mr. Abare in the impeachment of the DNA expert Mr. Ritzline, the husband of the prosecuting attorney Ms. Nelson. At trial, the prosecution team claimed that the actual physical evidence was not in the State's Exhibit 5, it was "left at the laboratory inside a freezer" (TT. 501-502). Therefore, the prosecutor Ms. Nelson had a person stake in withholding of the 12 pages of evidence from the defense during trial as a tactical strategy to prevent trial counsel from impeaching her husband, the DNA expert before the court and jury, in order to get a conviction.

A20     Trial counsel Mr. Abare could not have obtained the actual photographs of evidence from the crime lab prior to trial since the prosecuting attorney Ms. Nelson's husband, Mr. Ritzline the DNA expert, had actual physical possession over the 13 pages of evidence that was at the Indian River Crime Laboratory where he worked. Mr. Ritzline, the DNA expert, had a personal stake in the non-disclosure of the 13 pages of evidence in order to avoid being impeached by the defense counsel at trial and to avoid a judgment of acquittal being granted in the defense's favor and to avoid being prosecuted for giving false testimony in a court proceeding under §837.02, Fla. Stat. (2003).

A21     One must know the prosecuting attorney Ms. Kathryn M. Nelson slept with her husband the DNA expert Mr. Ritzline every night. Prior to him testifying in open court, the prosecutor told him (her husband/the DNA expert) what she needed him to testify to.[13] One must assume so since Ms. Nelson was a well educated prosecuting attorney for many years specializing in sex crime prosecution. She knew that if the defense knew that the evidence was not the actual physical aborted fetus received and tested for paternity DNA testing, trial counsel Mr. Abare would have moved the trial court by a motion to have the DNA findings excluded prior to trial and/or during trial. Trial counsel would have developed a defense regarding the DNA material that was received and tested prior to trial and the outcome of the trial would have been different.

A22     At Mr. Khan's trial, the prosecuting attorney Ms. Nelson's husband Mr. Ritzline the DNA expert testified that on May 24, 2002, he received a product of conception – a fetus[14] – "the aborted fetus," for paternity DNA testing (T.T. 487-88), a "body part that could be easily recognized,"[15] (T.T. 525:16-17) contrary to the photograph in Exhibit 1, pp. 3-4.

---

[13] One must assume the prosecutor is the person who told the DNA expert that the evidence he received was "the products of conception" as the DNA expert stated "somebody told me it was the products of conception." T.T. 525:16-25. Due to the fact in pretrial proceeding the prosecutor told the trial court it was the "products of conception." See, Exhibit 12.

[14] Fetus, or Foetus, a flexible term for an unborn child. In some jurisdictions, the time which elapses after conception affects the definition. See Exhibit 10 and 19.

[15] Part, a share, less than the whole, e.g., part payment or part payment or part performance. Organs, tissues, eyes, bones, arteries, blood other fluids and any other portions of the human body.

      A23    The DNA expert testified that the Movant Mr. Khan could be the donor of the DNA from the products of conception and Movant's son Robelto Khan was not a donor and not the father of the aborted fetus (T.T. 511, 514-15, 529). The DNA expert also testified that there was an anomaly in the DNA from the products of conception that the Defendant also possessed but that the victim did not (T.T. 515) and that the Movant was not excluded from being the father (T.T. 516-17), not a fetus or products of conception or a body part of a child.[16]

      A24    Had defense counsel Mr. Abare possessed the photographic evidence contained in Exhibit 1, pp. 3-4, 11, counsel[17] Mr. Abare would have been able to impeach the DNA expert during trial; regarding the physical evidence he actually received for paternity DNA testing when the DNA expert testified that the evidence was a "body part that could be easily recognized" (T.T. 525:16-17) and the outcome of trial and/or appeal would have been different. Therefore, a new trial is warranted.

**Second Requirement under *Jones* I, II, III, and *Swafford*, supra. The newly discovered evidence must be of such a nature that it would probably produce an acquittal on retrial.**

      A25    At a retrial, the trial court would be compelled to grant a judgment of acquittal regarding Count Three due to the destruction of the actual physical aborted fetus prior to any paternity DNA testing being conducted,[18] where the State failed to collect the actual physical aborted fetus after the abortion center conducted the partial delivery abortion on May 21, 2002 and only received amniotic sac fluid and tissues of the placenta from the child victim's body (T.T. 458-459) also (T.T. 350:22-25). Under *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *Valein v. Public Health Trust of Dade County*, 473 So.2d 297 (Fla. 3rd DCA 1984) approved 507 So.2d 596 (Fla. 1987).

      A26    At a retrial, that trial counsel, will not be allowed to select any biased jurors as the prior counsel did in the prior trial, selecting two (2) biased jurors as a tactical trial strategy; Dr. Rosa would not be allowed to give her hearsay testimony as she did in the prior trial, regarding the allegations for Count 1; Robelto Khan would not be allowed to give the same testimony at a retrial regarding Count 2, nor would the State be allowed to use Robelto Khan's prior trial transcripts during the retrial due to Robelto Khan's affidavit filed on March 20, 2013 claiming that he lied in the prior trial.

      A27    At a new trial, that State prosecutor would not be allowed to present any evidence, one of the most inflammatory issues of our time to the jury – evidence of an abortion – in the retrial to the jury or the court as the prior prosecutor did in the prior trial in opening (T.T. 101-11) during trial, (T.T. 448-460) and in closing (T.T. 631-634). Because Mr. Khan himself will make all objection and cite *Stephenson v. State*, 31 So.3d 847 (Fla. 3rd DCA 2010); *U.S. v. Natson*, 469 F.Supp.2d 1253 (M.D. Ga. 2007).

      A28    At a new trial, the State would not be allowed to present the population geneticist Dr. Martin Tracy's testimony because his testimony came directly from the DNA expert Mr. Earl Ritzline's findings, where Mr. Tracy did not see the actual aborted fetus and/or conduct any

---

[16] The abortion center only conducted a partial delivery abortion on May 21, 2002 because no one testified that it was a brain suction abortion, in fact, a brain suction abortion is illegal see Exhibit 17; no one had cut up the 23 week old human being and given a foot or body part of that dead child under the age of 18 to the chain of custody officer (T.T. 458-459). Mr. Khan attached a photograph of a 5 week, 11 week, 20 week, 24 week, 32 week and a full term fetus old product of conception fetus, a tiny child, for this Court to understand what the evidence should have shown through the photographs in Exhibit 1, see Exhibit 10 and 19.

[17] Looking at the photographs in Exhibit 1, pp 3-4., the evidence solely shows fluid material within the container – and not recognizable body parts. (T.T. 525:16-25). This evidence is amniotic sac fluid and tissues of the child victim's placenta, not a fetus, as shown in Exhibits 10 and 19.

[18] *T.M.H. v. T.M.T.*, 79 So.3d 806 (Fla. 5th DCA 2011) provides the definition of "Products of Conception." it is not fluid, it is the actual fetus. *Ob Gyn v. Ana Mejia and Rodolfo-Santana*, 39 Fla.L.Weekly D110 (Fla. 4th DCA January 8, 2014). Also see Exhibit 10 and 19 which show a photograph of a fetus. See Exhibit 10 and 19.

testing on that actual aborted fetus himself. His testimony was in fact hearsay testimony which must be excluded at a retrial.

A29     The newly discovered evidence would probably produce an acquittal on retrial regarding Count Three and would probably produce an acquittal at a retrial regarding Counts One and Two due to the fact that there would not be any DNA testimony presented regarding paternity DNA testing at a retrial and Mr. Khan would argue for a judgment of acquittal and would argue as follows:

"Yes, judge, defense moves for judgment of acquittal on all two counts. With respect to the sexual battery count, Judge, it's the government's obligation to prove either that Roger Khan either penetrated or had union with – his sexual organ with the sexual organ of the vagina Nakita or that he penetrated her with an object. There's been absolutely no evidence whatsoever to prove that count, to prove that aspect of that count. The fact that she was twelve years of age or older, but less than eighteen years of age, that's been proven. The fact that she was his daughter, I think that has been proven. But the actual physical act that's got to be proven in that count has not been proven. There is no evidence whatsoever that he, in any way, touched her even. No less penetrated her, had union with the sex organ or penetrated her with an object. That has not been shown by one shred of evidence in this courtroom. The second count is incest, which requires that Nakita Khan be the daughter of Roger Khan had sexual intercourse with Nakita. sexual intercourse is the penetration of the female sex organ with the male sex organ. That has not been proven. …. The third - - the other argument that we have here, Judge, is that the government has not proven venue. They must prove venue beyond or within a reasonable certainty of to a reasonable certainty. And in this case there has been no testimony whatsoever by either the victim in this case or by any of the witnesses that would have testified or by Mr. Khan's own admission that, in fact, any of these acts would have occurred in St. Lucie County. There's just no evidence. There's no evidence whatsoever. And just like there's no evidence of the - - the act of either penetration or union, there's no evidence that if, in fact, an act had occurred, that it occurred in this country. And for those reasons, Judge, we move for judgment of acquittal on all two counts.

A30     And there is a reasonable probability the trial court would grant a judgment of acquittal on retrial for the lack of evidence and the lack of the alleged child victim's testimony.

A31     Had the State disclosed to the defense the newly discovered evidence received on September 8, 2014 prior to trial, trial counsel could have utilized it to impeach the DNA expert Mr. Ritzline at trial, when the DNA expert testified that on May 24, 2002 he received the products of conception still on ice and that he had to keep it frozen to prevent it from bacterial growth (TT. 487-93). He further testified that the part of the tissue he tested for paternity DNA testing was a body part that could be easily recognized (T.T. 525:16-17). Therefore, had the State disclosed the evidence to trial counsel prior to trial, trial counsel would have been well aware that the DNA expert, Mr. Ritzline, was in fact lying and misrepresenting the actual physical evidence he received for paternity DNA testing on May 24, 2002. Counsel would have used Exhibit 1 and 10 to impeach the DNA expert during trial and would have presented the photographic evidence to the jury for the jury to consider.

A32     Trial counsel would have utilized these photographs and the written document in Exhibit 1, pp. 3-4, and 11 and could have used Exhibit 10 and 19 to impeach the State's DNA expert at trial and the trial court would have excluded the DNA expert's findings regarding Count Three and there is a reasonable probability the trial court would have granted a judgment of acquittal on all Counts (T.T. 608-11).

A33     Had the trial court excluded the DNA expert's findings, the State would not have been allowed to argue the jury in closing argument as follows:

"Twelve year old Nakita was pregnant. After she was pregnant, her mother came over from Trinidad and took her to have an abortion. Because that's what she wanted. So they went down to

West Palm and Detective Holman and Detective Dennis stayed in the room with her and Detective Dennis stayed in the room and actually saw the procedure being performed. And actually collected part of the aborted fetus from twelve year old Nakita and that fetus or products of conception was sent to our crime laboratory here in Fort Pierce. For DNA testing. For paternity testing. And the purpose of that obviously was to find out who the father of the aborted fetus.
And Earl Ritzline, who is my husband you all heard that, took an oath to tell the truth, he did the DNA in this case and you can't manipulate the DNA, you can't change the DNA. The DNA is what it is. DNA doesn't lie. And he told you of all the controls, all the procedures that the lab utilizes to insure the integrity of the evidence, to insure that they get a reliable result, and he took the products of conception and he compared it to the blood sample of the defendant that he drew, and with the blood or the DNA sample from Nakita that detective Dennis took with swabs. And he showed you how it works and what it looks like. And explained to you that. And based upon the DNA and this was Robelto Khan, the defendant had given to the aborted fetus, half of the DNA. And what was really interesting and when you look at this graph and you go back here on the second page. What was really interesting was that there was a particular anomaly, a little – a little tiny peak that the defendant had in his DNA that he passed on to the aborted fetus, and even Nakita didn't have that. The defendant passed that on to his child, the grandchild, Nakita's baby." TT. 631-632.

      A34    Without such closing argument by the prosecutor, there is a reasonable probability the outcome would have been different due to the fact that the State would not have had any DNA evidence to suggest to the jury that there must have been some type of penetration and/or union to cause the impregnation of the minor child victim. This caused the jury to render a guilty verdict on Counts One and Two. Without the DNA expert testimony, there is a reasonable probability the jury would have rendered a not guilty verdict on Counts One and Two. The newly discovered evidence is of such a nature that it would probably produce an acquittal at retrial on Count Three and Mr. Khan would receive a lesser sentence. *Jones v. State*, 709 So.2d 512, at 521-522 (Fla.) cert. den. 523 U.S. 1040, 118 S.Ct. 1350, 140 L.Ed.2d 499 (1998). Therefore, a new trial is warranted as a matter of law.

(b)     If you did not exhaust your state remedies on **Ground Eight**, explain why: **I was prohibited from the Fourth DCA and therefore could not have appealed. (See Appendix 7). I was unable to pay an attorney $20,000.00 in order to do the appeal. (See Appendix 9).**

(c)     **Direct appeal of Ground Eight:**

     (1)     If you appealed from the judgment of conviction, did you raise this issue?

          Yes ☐     No ☒

     (2)     If you did <u>not</u> raise this issue in your direct appeal, explain why: **The issue was not discovered then and had the issue been presented to the Fourth DCA panel the court panel would not have considered the DNA evidence as overwhelming evidence of guilt (See Appendix 8).**

(d)     **Post-Conviction Proceedings:**

     (1)     Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

          Yes ☒         No ☐

     (2)     If your answer to Question (d) (1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed: **The 19th Judicial Circuit Court, in and for St. Lucie County, Florida, P.O. Box 700, Ft. Pierce, FL 34954**

Docket or case number (if you know): **562002-CF-1166A**

Date of the court's decision: **June 16, 2015 and July 14, 2015**

Result (attach a copy of the court's opinion or order, if available): **(See Appendix 4).**

(3)     Did you receive a hearing on your motion or petition?

           Yes ☐            No ☒

(4)     Did you appeal from the denial of your motion or petition?

           Yes ☐            No ☒

(5)     If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal?

           Yes ☐            No ☒

(6)     If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the motion or petition was filed: **N/A**

Docket or case number (if you know): **N/A**

Date of the court's decision: **N/A**

Result (attach a copy of the court's opinion or order, if available): **N/A**

(7)     If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue: **I was sanctioned and prohibited from filing in the Court pro se. (See Appendix 7). I could not afford to pay an attorney $20,000 to do the appeal. (See Appendix 9).**

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on **Ground Eight**: **Habeas filed on August 2, 2011, November 21, 2012 and refiled on March 20, 2013.**

**GROUND NINE: Newly Discovered Evidence which warrants a new trial where at trial the State prosecuting attorney knowingly allowed a DNA expert (her husband) to testify falsely concerning the DNA material he received for paternity DNA testing in violation of Giglio, which violated Mr. Khan's rights to due process of law pursuant to the 5th, 6th, 8th, and 14th Amendment rights under the United States and Florida Constitutions which warrants dismissal of all charges and/or a new trial.**

(a) Supporting facts: The State court unreasonably applied clearly established Federal law by rejecting Petitioner's claim of newly discovered evidence without first conducting an evidentiary hearing and/or refuting the claim. When Petitioner stated to wit:

**Notice: For clarification Petitioner attached the exhibits of this Ground as Appendix 13.**

Mr. Khan states that he received newly discovered evidence from the Indian River Crime Laboratory on September 8, 2014 that included four photographs that reveals what seems to be solely fluid material which identified within as "amniotic sac fluid, and tissues of the expulsion of the alleged child victim's placenta," (See Exhibit 1) contrary to the DNA expert Mr. Ritzline's pre-trial and trial testimony that he received into his laboratory "products of conception, aborted fetus" on May 24, 2002. (T.T. 487-493, 525). Such evidence, the photographs, was willfully withheld by the State prior to trial, during trial and throughout all post-conviction proceedings. *Mordenti v. State*, 894 So.2d 1161 (Fla. 2004). There should be no question, other than granting an evidentiary hearing at this time, due to the fact the newly discovered evidence would have assisted trial counsel, Mr. Edward J. Abare, Fla. Bar No. 874590 in the impeachment of the DNA expert, Mr. Earl L. Ritzline. Mr. Ritzline was the State's critical witness and was married to the prosecuting attorney, Ms. Kathryn M. Nelson Fla. Bar No. 402478. Both persons had a personal stake in the outcome of the DNA finding/ trial testimony which denied Mr. Khan a fair and impartial trial.

To prevail on a claim of newly discovered evidence, the evidence must be of such a nature that it would probably produce an acquittal on retrial. *Williamson v. Dugger*, 851 So.2d 84 (Fla. 1994); *Jones v. State*, 591 So.2d 911 (Fla. 1991); *Moss v. State*, 943 So.2d 946 (Fla. 4th DCA 2006). Therefore, an evidentiary hearing is warranted. *McGuffey v. State*, 515 So.2d 1057 (Fla. 4th DCA 1987) due to the Issue Two presented herein.

The standard of review is established by the Florida Supreme Court in *Jones v. State*, 591 So.2d 911 (Fla. 1991). Two requirements must be met in order to set aside a conviction or sentence because of newly discovered evidence.

**First Requirement: under *Jones* 1, 2, and 3; *Swafford v. State*, 125 So.3d 760 (Fla. 2013). The evidence must not have been known by the trial court, the party, on counsel at the time of trial and it must appear that the defendant or defense counsel could not have known of it by the use of diligence.**

B1     The trial court did not know that the evidence tested for paternity DNA testing by Mr. Ritzline was not the actual physical aborted fetus where in pretrial the prosecutor Ms. Kathryn M. Nelson told Judge Gieger that they received the products of conception. See Exhibit 12. During trial, Judge Dwight L. Geiger denied the Defendant's judgment of acquittal claiming that there is evidence that Mr. Khan is the father of the fetus. T.T. 611.

B2     Mr. Khan states that he did not know that the evidence collected was not the actual physical fetus, he was informed that he aborted fetus was destroyed after the paternity DNA testing was concluded by Mr. Ritzline. See, Exhibit 3, pp. 16-17.

B3     Trial counsel did not know that the evidence tested for paternity DNA testing was not the actual physical aborted fetus. Trial counsel truly thought that the chain of custody was broken (T.T. 455) and officer John Holman and officer Teresa Dennis only collected fluid material on May 21, 2002. Counsel McCrae thought that the State sent J. Harkins from the St. Lucie County, Florida Police Department to the abortion center to collect the actual physical aborted fetus and delivered it to the Indian River Crime Lab on May 24, 2002, as stated by the DNA expert at trial, that he received the aborted fetus, products of conception, on May 24, 2002. T.T. 487-493, "a body part," T.T. 525:16-17. See Exhibit 11.

**Second Requirement under *Jones* I, II, III, and *Swafford*, supra. The newly discovered evidence must be of such a nature that it would probably produce an acquittal on retrial.**

B4     With the newly discovered evidence in Exhibit 1, (which reveals the evidence to be amniotic sac fluid and tissues of the victim's placenta) the State would not be able to present any evidence of the abortion to the Court or jury, regarding paternity DNA testing and without the DNA evidence, the State would not be able to attempt to prove Count Three, child-abuse – impregnating a minor because the State failed to conduct a paternity DNA test on the aborted fetus, and there would probably produce an acquittal at retrial on Count Three, and Mr. Khan would receive a lesser sentence. *Jones* I, II and III. T.T. 611, regarding Count Three (*Jones* I, II, and III).

**Mr. Khan has met the two prongs of *Jones* and further states:**

B5     On September 8, 2014, Mr. Khan received newly discovered evidence that was willfully withheld by the State. *Brady v. Maryland*, 373 U.S. 83 (1963); *Strickler v. Greene*, 189 S.Ct. 193 (1999); *Guzzman v. State*, 868 So.2d 498 (Fla. 2003); *Mordanti v. State*, 894 So.2d 161 (Fla. 2004), which strongly supports the claim that the State intentionally knowingly utilized perjured trial testimony as a tactical trial strategy, a *Giglio* violation. *Giglio v. United States*, 405 U.S. 150 (1972); *Guzzman v. Secretary F.D.O.C.*, 661 F.3d 602 (11th Cir. 2011), which denied Mr. Khan a fair and impartial trial. *Stephenson v. State*, 31 So.3d 847 (Fla. 3rd DCA 2010) citing *Cooks*.

**Mr. Khan has met all three prongs of *Giglio*:**

*Giglio* **Prong One: Movant must show that the testimony was false.**

B6    On September 8, 2014, Mr. Khan did for the first time receive newly discovered evidence from the Indian River Crime Lab; four photographs and one written document – displaying the DNA evidence material reveals to be fluid material – amniotic sac fluid and tissues of the alleged child victim's placenta inside of what appears to be a urine specimen container. See Exhibit 1, pp. 3-4, contrary to the DNA expert trial testimony.

B7    At trial, the DNA expert Mr. Ritzline testified to the court and jury that on May 24, 20112, he received at the laboratory the products of conception, an aborted fetus, which was on ice, still frozen. T.T. 487-493. He further testified that it was a body part that could be easily recognized, T.T. 525:16-17.

B8    Mr. Ritzline also testified that the Defendant could be the donor of the DNA from the products of conception and that his son, Robelto Khan, was not a donor and not the father of the aborted fetus. T.T. 514-15, 529.[19] Mr. Ritzline also testified that there was an anomaly in the DNA from the products of conception that the Defendant also possessed, but that the victim did not. T.T. 515. Mr. Ritzline testified that the Defendant was not excluded from being the father of the aborted fetus. T.T. 515-17. Therefore, Mr. Khan has met the first prong of *Giglio* and evidentiary hearing and new trial is warranted.

B9    Had Mr. Khan received this evidence, when he ordered the State Attorney's files on or around 2005 or 2006, he would have raised the claim within his first motion for post-conviction relief filed on May 31, 2006 and/or soon thereafter that but for the State's non-disclosure of the evidence the issue was unknown to the Movant, the attorneys, and the trial court. *Thompkins v. State*, Bill McCollum etc, 994 So.2d 1072 (Fla. 2008). With all citing within in favor of the Movant and an evidentiary hearing is warranted as a matter of law and/or a new trial.

*Giglio* **Prong Two: Movant must show that the prosecutor knew that the testimony was false.**

B10    Prior to having the DNA expert testify before the jury, the prosecutor questioned one of the chain of custody officers, Mr. John Halmon, regarding the evidence he collected. Halmon testified:
"[I]t was very small, to be honest it was the size of a urine specimen cup, about that big, with just some fluid in there, material." T.T. 350:22-25.

Further, the prosecutor questioned the second chain of custody officer, Mr. Teresa Dennis, who testified: "[T]he items were handed to me in a small container, I seen the item come from Nakita Khan's body through a tube into a glass container into another container." T.T. 458:18-22.

Dennis further testified:
"I'm sorry, there was more than one container from Nakita's body through a tube to a glass jar. The contents of that jar from Nakita's body was put into a plastic container where items were collected from that and placed into a small cylinder type container, which is what was given to me." T.T. 459:3-7.

In fact, the prosecutor herself testified in a side bar outside the Defendant's and the jury's presence that: "[T]he evidence was not in fact the – the fetus that was taken during the abortion." T.T. 455:10-11.

---

[19] *T.M.H. v. T.M.T.*, 79 So.3d 806 (Fla. 5th DCA 2011) provides the definition of "Products of Conception," it is not fluid, it is the actual fetus. *Ob Gyn v. Ana Mejia and Rodolfo-Santana*, 39 Fla.L.Weekly D110 (Fla. 4th DCA January 8, 2014). Also see Exhibit 10 and 19 which show a photograph of a fetus. See Exhibit 10 and 19.

B11    Therefore, Mr. Khan has met the second prong of *Giglio*. An evidentiary hearing and a new trial are warranted.

**Giglio Prong Three: The Movant must show that the statement was material.**

B12    The statement of the DNA expert was in fact material, where his wife, the prosecuting attorney Ms. Kathryn M. Nelson intentionally used the DNA evidence material as a foundation of the State's case as the prosecutor presented one of the most inflammatory issues of our times to the jury in jury selection (*Stephenson v. State*, 31 So.3d 847 (Fla. 3rd DCA 2010) citing *Cooks*), when the prosecutor stated as follows:

"Does anyone, I know this is a very personal question, and again I'm not trying to put anybody on the spot or anything, but I just need to know, does anybody have feelings about abortion that you would be so bothered by it. And I know that people do have strong feeling or some people are pro life that are against it. And they might have a problem sitting in a case where that would be an issue. Does anybody have any thoughts or feeling about that particular topic, about abortion?" TT. 101:8-18.

"And that's you know, my question, like I said there are some people that are pro life and they're against abortion. That doesn't mean that you couldn't sit in a case. I want to make sure that no one is going to be some offended by the evidence that they did just could not sit in this type of case." T.T. 102:10-15.

"I know there are some people that feels that way about it they're against abortion, but it's a matter of a woman or a child being raped you know, against them, sometime, it's acceptable in those circumstances." T.T. 103:15-18.

"Let me go ahead and pass it back. What I'll do is try to save some time. Is there anybody on the fourth row that does – does have strong feeling about the issue of abortion that it might be a problem for you to sit in a case. With that a feature, raise your hand, everyone on that fourth row is okay, all right. Let me go back to the fifth row. Raise your hands if you have strong feeling and it might be a problem for you." T.T. 404:15-22.

"Let me ask you and again, I know everybody has strong feeling about this, even if you don't agree with it, if it became an issue and 'there was evidence of it' would you still be able to be…" T.T. 105:1-4.

"I'm not asking you if it would bother you because I understand it can be very disturbing and it is disturbing, but would you be able to be fair if it – if you heard that." T.T. 105:7-10.

"Anyone else in that last – last row? Is there anybody that just cannot believe – is there anybody that just cannot believe – that you just cannot believe in your mind that there are adults in our society that use children for sex. That you just don't believe it happens because its just unfathomable. You just cannot believe it. Is there anybody that feels that way. That's just – it just doesn't happen. You just can't imagine it?" T.T. 105:12-18.

"All right. Cause there are some people that just refuse to believe, they just cannot believe that there are adults that use children for sexual gratification. How about – does anybody here just – just refuse to believe charges that – such as this that a father would have sex with his own daughter. And I know that it's unbelievable. But you just think it's impossible that this happened.

Because you just can't image it happening in your mind. Anybody feel that way? Let's see. Mr. Mitchell." T.T. 106:2-10.

   B13  The prosecutor got the jury to understand that there was an abortion conducted in the State's case and the prosecution received an aborted fetus for paternity DNA testing. Now the prosecutor informed the jury in jury selection about the DNA evidence as follows:

| | |
|---|---|
| Prosecutor: | Thank you. Has anyone heard DNA evidence. Did you have any science class a long, long time ago or maybe from watching the court shows on TV or maybe someone here has been involved in a paternity test? Mr. Gibson, have you take the microphone. |
| Mr. Gibson: | Yes, was that recently, or – it's been – about six seven years ago |
| Prosecutor: | That was to determine whether you were the father? |
| Mr. Gibson: | Yes. |
| Prosecutor: | Of a child? |
| Mr. Gibson: | Yes. |
| Prosecutor: | Did you go through the court system to do that? |
| Mr. Gibson: | Yes. |
| Prosecutor: | Do you have any feeling about paternity testing? |
| Mr. Gibson: | No. |
| Prosecutor: | Did the paternity test show that you were, in fact, the father of the child? |
| Mr. Gibson: | Yes, it did. |
| Prosecutor: | Did you have to give a blood sample? |
| Mr. Gibson: | Uh huh, yes. |
| Prosecutor: | To do a DNA test? |
| Mr. Gibson: | Uh huh. |
| Prosecutor: | So you don't have any feelings one way or the other… |
| Mr. Gibson: | Oh, that science don't lie. |

T.T. 108:10-25; p. 109:1-14.


The prosecutor inquired further as follows:
"Anyone else been involved in a paternity test? Anybody else have any specialized knowledge about DNA? Whether it's from science class. Everybody probably knows you get half of your DNA from your mom, half from your dad. That's what makes your, you know, your eyes brown or blue and your hair color. But other than that anybody have any knowledge about DNA. Have any feelings about it? About either its accuracy or it's not accurate? How about on the front row? Anybody?

| | |
|---|---|
| Mr. Conrad: | It's pretty reliable. Doesn't lie. (T.T. 109:15-25). |

"Anybody else on the first row have any thoughts, ideas, feelings, one way or the other about DNA?

| | |
|---|---|
| Ms. Hileu: | I think it's accurate. T.T. 110:19-25. |
| Ms. Rosch: | Yeah, It's accurate. |
| Ms. North: | It's accurate. |
| Mr. Jolley: | I feel it's accurate. T.T. 111:3-9. |

   B14  In the instant case, the State won its case in jury selection by the above alleged statements regarding paternity DNA testing of the aborted fetus because Juror Ms. Torres was in fact a juror who was against abortion. T.T. 103:25; 104:2. Ms. Torres Ms. Torres stated that she

could not give Mr. Khan a fair and impartial trial (T.T. 125:22:25 and p. 26:1-7) and served as a juror, (T.T. 166:18-24).

Juror Mr. Jolley, thought DNA testing was in fact "accurate and doesn't lie." T.T. 111:9, Jolley became a juror. T.T. 167:1.

Juror Mr. Conrad believed that DNA test "is pretty reliable and doesn't lie." T.T. 109:24-25. Mr. Conrad also studied DNA in school and believed that it's pretty accurate, and never heard of any mistakes with DNA test. T.T. 110:2-5. He became a juror. T.T. 166:23.

Juror Mr. Murray claimed he read the papers and "it looks like it's a reliable test for what they use it for." T.T. 110:8-10. He to became a juror. T.T. 166:23.

Juror Ms. Davis believed in DNA from what she heard and read. T.T. 110:18. She to became a juror. T.T. 166:24.

Juror Ms. Espinoza stated due to the State's examination in jury selection, that she could not give Mr. Khan a fair and impartial trial. T.T. 122:1-12. She to became a juror. T.T. 166:22.

Juror Ms. Martin stated before the prosecuting attorney when she was questioned by the defense counsel, "Given the nature of the charges, do you think you'd be a good juror in a case like this?" She said, "I hope so. I hope I would be open minded and listen to the facts and ..." T.T. 140:16-25. She became a juror. T.T. 166:21.

B15     The prosecuting attorney Ms. Kathryn M. Nelson, intentionally tried the Movant with the following jurors: Ms. Espinoza, Ms. Torres, Mr. Conrad, Ms. Murray, Ms. Davis, and Mr. Jolley as the foreman of the jury. T.T. 166-167. Therein, she presented, the alleged victim's mother, Nadine Khan, who claimed before the jury that she took her daughter to have an abortion. T.T. 319:23, and she was actually in the room with her daughter while the abortion was being conducted and that her daughter was in a lot of pain. T.T. 320-321. Therein, the prosecutor asked Nadine Khan whether the detective talked to her about getting the fetus from the abortion and taking it, which Nadine Khan stated, "Yes." T.T. 321:4-6. The prosecutor presented its second witness, detective John Hallman, before the jury who claimed that he took the alleged child victim to the abortion center in West Palm Beach. T.T. 350:22-25.

B16     In fact, the prosecuting attorney intentionally presented a second detective, Ms. Teresa Dennis, to the jury for the sole purpose of presenting "the most inflammatory issues of our time." *Stephenson v. State*, 31 So.3d 847 (Fla. 3rd DCA 2010). The prosecutor informed the court in a side bar:

"... Your honor, and my only purpose is to establish that the items that were taken into evidence actually came from Nakita. It was the fetus that was aborted just to ... that there's no question that she took it and that it was turned into evidence and that's what Mr. Ritzline examined. All I was planning is that she saw she actually saw the items come out of Nakita. She went and was given certain items that were packaged in a container that was turned over to the crime lab. If defense counsel is willing to agree that they're not going to agree anything about the integrity of the evidence or the abortion – I have no problem just saying, 'Did you collect the evidence? Is this a picture of what you collected? Was it sealed? Was it turned over?'" T.T. 454:16-25, 455:1-4.

The prosecution was further allowed to question Detective Ms. Dennis before the jury:

| | |
|---|---|
| Prosecution: | Did you collect items found from that abortion? |
| Ms. Dennis: | Yes. |
| Prosecution: | And did you actually witness and see the items that you collected coming from Nakita's body? |
| Ms. Dennis: | Yes, I did. |
| Prosecution: | Can you explain how you collected the items as far as after the procedure was completed and what you did? |
| Ms. Dennis: | The items were handed to me in a small container. |

| Prosecution: | Did you – were you able to see the itmes as they were packaged and then handed to you? |
|---|---|
| Ms. Dennis: | Yes, I see the items come from Nakita Khan's body through a tube into a glass container into another container. |

T.T. 458:13-22.

Counsel objected and the court overruled. T.T. 458:22-25.

| Ms. Dennis: | I'm sorry, there was more that one container from Nakita's body through a tube to a glass door, the contents of that jar from Nakita's body was put into a plastic container were items were collected from that and placed into a small cylinder type container; which is what was given to me. |
|---|---|

T.T. 459:3-7.

Ms. Dennis gave the small cylinder type plastic container to her partner, Mr. John Halmon. T.T. 460:8.

B17     The prosecution presented her husband, Mr. Ritzline, as a "team worker." T.T. 465-529, who testified according to his duties with the Indian River Crime Lab:
"My specialties are forensic serology, which nowadays deals with DNA analysis and which is the examination of body fluids which includes blood, things like that, it also includes drawing bloods, things like that." T.T. 466:15-18.

B18     Mr. Ritzline also testified that the laboratory was not licensed or accredited by the AABB. T.T. 485:11-19.

B19     Mr. Ritzline claimed he received the evidence, which was in a plastic container that was listed as containing products of conception and that was on May 24, 2002. T.T. 487:1-3.

| Prosecution: | And when you say products of conception, are you referring to tissue from an abortion? |
|---|---|
| Mr. Ritzline: | Yeah. It would be abortus is what they kind of refer to it so it's an aborted fetus, yes. |
| Prosecution: | And is that the term scientifically you call it products of conception? |
| Mr. Ritzline: | Yes. Yes, that's a medical term that we tend to use. |
| Prosecution: | I'll show you what's been introduced into evidence as Exhibit 5, number 5, if you'll just take a look and see if that what you received into your laboratory? |
| Mr. Ritzline: | Yes, this is a container inside of a couple other containers. .... in this particular instance, it was sealed and it was on ice. Still frozen actually. |
| Prosecution: | What date did you receive the products of conception into the laboratory? |
| Mr. Ritzline: | May 24, 2002. |

T.T. 487.

B20     Mr. Ritzline further informed the jury that the products of conception was placed into the laboratory freezer in the DNA section. T.T. 488:3-5, and claimed to the jury that he had to keep it in the freezer because one of the bad things that can happen to DNA is being exposed to bacteria which can degrade it and cause it 'not to work.' "It's kind of like leaving your – if you left a steak out on the counter top you know how it gets after a while, not trying to be gross or anything, so you just don't want that happening so you have to keep it frozen." T.T. 488.

B21     Mr. Ritzline further testified that he needed to do some sort of comparison to see who is the biological father of the products of conception. T.T. 489:20-22. He testified he

received the blood sample from Roger Khan, T.T. 490:3-6. He testified that the fetus – or the aborted products of conception, would have been screened:[20]

"[W]hat I do is I look for the presence of a major piece of tissue and then I take cuttings from the tissue, the products of conception tissue." T.T. 493:21-25.

The prosecution asked the team, her husband

| Prosecution: | Were you able to obtain readable results from the items that you looked at, the blood of the Defendant, products of conception and the DNA from Nakita Khan? |
|---|---|
| Mr. Ritzline: | Yes. T.T. 497:1-4. |

B22     Mr. Ritzline claimed that all the evidence was left inside the freezer at the laboratory and nothing was inside the containers for in-court identification of the actual physical aborted fetus. T.T. 501-502.

B23     Mr. Ritzline testified that the tissue, products of conception, was a female child. T.T. 514:12-13.

B24     Mr. Ritzline testified that the Defendant could be the donor of the DNA from the products of conception, and that his son, Robelto Khan, was not a donor and not the father. T.T. 511, 514-15, 529. Mr. Ritzline also testified that there was an anomaly in the DNA from the products of conception that the defendant also possessed, but that the victim did  not. T.T. 515. Mr. Ritzline testified that the Defendant was not excluded from being the father. T.T. 516-17. Dr. Tracy testified that it was his opinion that the Defendant was the father of the products of conception. T.T. 546.

B25     Trial counsel Mr. Abare questioned Mr. Ritzline the prosecution team, the DNA expert, regarding the actual physical evidence he received for paternity DNA testing. Mr. Ritzline stated,

| Mr. Ritzline: | Well, the part of the tissue, that I analyzed was a body part that could be easily recognized so yes, of course, well, somebody told me that's what that was. |
|---|---|
| | … Somebody told me that it was – well, it was a body part so somebody so someone told me it was the products of conception. Yes. |
| Counsel: | Okay. A products of conception, but with respect to whose it was or where it came from you have no personal knowledge of that do you sir? |
| Mr. Ritzline: | No, I do not. |

T.T. 525:16-25.

Mr. Ritzline agreed that you can do anything to change the DNA, to make it what you want, but that's not me, he said. T.T. 531:10-16.

B26     Had the prosecutor not presented to the Court and jury the evidence collected for paternity DNA testing was the products of conception, the aborted fetus, there is a reasonable probability the trial court would have granted a judgment of acquittal on Count Three, due to the fact no one testified in open court that the Defendant had sexual intercourse with the alleged child victim and got her impregnated, on a special date and time. There was no DNA evidence received from the alleged child victim's sexual organ to prove sexual intercourse by the Defendant in order to prove impregnation.

B27     The trial court denied counsel's motion for judgment of acquittal claiming that "there is evidence that Mr. Khan is the father of the fetus." T.T. 611.

B28     Mr. Ritzline testified under oath that he did not know where the evidence came from and that somebody told him it was a products of conception. T.T. 525:16-25.

The evidence was only fluid material as detective Dennis testified to under oath:

---

[20] *T.M.H. v. T.M.T.*, 79 So.3d 806 (Fla. 5th DCA 2011) provides the definition of "Products of Conception," it is not fluid, it is the actual fetus. *Ob Gyn v. Ana Mejia and Rodolfo-Santana*, 39 Fla.L.Weekly D110 (Fla. 4th DCA January 8, 2014). Also see Exhibit 10 and 19 which show a photograph of a fetus. See Exhibit 10 and 19.

"[T]he items were handed to me in a small container, I seen the item come from Nakita Khan's body through a tube into a glass container into another container." T.T. 458:18-22.
Dennis further testified:
"I'm sorry, there was more than one container from Nakita's body through a tube to a glass jar. The contents of that jar from Nakita's body was put into a plastic container where items were collected from that and placed into a small cylinder type container, which is what was given to me." T.T. 459:3-7.

    B29    Detective John Halmon testified under oath that the evidence he received from Detective Dennis "was very small, to be honest it was the size of a urine specimen cup about that big, with just some fluid in there, material." T.T. 350:12-25.

    B30    Therefore, the DNA expert's trial testimony was evidence that was used by the trial court to deny Mr. Khan judgment of acquittal, when the trial court stated as follows:
"There is evidence that Mr. Khan is the father of the fetus looking at this evidence then there is a prima facie case as to Counts One Two and Three." T.T. 611.

    B31    Thereafter, the State prosecuting attorney presented again one of the most inflammatory issues of our times to the jury in closing argument, *Stephenson v. State*, 31 So.3d 847 (Fla. 3rd DCA 2010).
"Twelve year old Nakita was pregnant. After she was pregnant, her mother came over from Trinidad and took her to have an abortion. Because that's what she wanted. So they went down to West Palm and Detective Holman and Detective Dennis stayed in with her and Detective Dennis stayed in the room and actually saw the procedure being performed. And actually collected part of the aborted fetus from twelve year old Nakita and that fetus or products of conception was sent to our crime laboratory here in Fort Pierce. For DNA testing. For paternity testing. And the purpose of that obviously was to find out who the father of the aborted fetus.

And Earl Ritzline, who is my husband you all heard that, took an oath to tell the truth, he did the DNA in this case and you can't manipulate the DNA, you can't change the DNA. The DNA is what it is. DNA doesn't lie. And he told you of all the controls, all the procedures that the lab utilizes to insure the integrity of the evidence, to insure that they get a reliable result, and he took the products of conception and he compared it to the blood sample of the defendant that he drew, and with the blood or the DNA sample from Nakita that detective Dennis took with swabs. And he showed you how it works and what it looks like. And explained to you that. And based upon the DNA and this was Robelto Khan, the defendant had given to the aborted fetus, half of the DNA. And what was really interesting and when you look at this graph and you go back here on the second page. What was really interesting was that there was a particular anomaly, a little – a little tiny peak that the defendant had in his DNA that he passed on to the aborted fetus, and even Nakita didn't have that. The defendant passed that on to his child, the grandchild, Nakita's baby." TT. 631, 632:1-19.

The State prosecutor further argued the jury
"The State has proven all these charges beyond a reasonable doubt by the testimony of all the witnesses, by the DNA that the Defendant had sex with his own daughter. And got her pregnant and it is really unbelievable, but he did, DNA does not lie. The defendant had sex with his daughter and got her pregnant." T.T. 634:18-24.

"Because of what he did to her, his own twelve year old daughter having sex with her and getting her pregnant." T.T. 635:18-20.

"The State has to prove beyond a reasonable doubt that he committed these crimes so not beyond a shadow of a doubt. Not beyond a possible doubt, not beyond all doubt, but beyond a reasonable doubt, and the State has done that in this case by the evidence by the witnesses' testimony, by the

Exhibits in evidence. The State asks you to go back to the jury room and to find the Defendant guilty of these crimes to hold him responsible for what he did to his twelve year old daughter." T.T. 635:22-25, 636:1-4.

B32    Mr. Khan has met the third prong of *Giglio*, *Guzman*, and requests an evidentiary hearing and the State bear the burden to show that it was harmless error, for allowing false testimony to be considered by the jury of evidence against Mr. Khan; because without the DNA testimony at trial, it would probably have produced an acquittal at the previous trial. T.T. 608-611. Without the DNA testimony, this Court would probably grant an acquittal on retrial. *Jones* I, II, and III.

(b)    If you did not exhaust your state remedies on **Ground Nine**, explain why: **I was sanctioned by the Appellate Court and could not file any pro se appeal. (See Appendix 7). I could not afford to pay an attorney $20,000 to do the appeal. (See Appendix 9).**

(c)    **Direct appeal of Ground Nine:**

(1)    If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐                    No ☒

(2)    If you did <u>not</u> raise this issue in your direct appeal, explain why: **I was represented by an attorney who did not investigate or discover the issue. Had the issue been presented to the Fourth DCA, he judge panel would not have considered the DNA evidence as overwhelming evidence of guilt. (See Appendix 8).**

(d)    **Post-Conviction Proceedings:**

(1)    Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ☒                    No ☐

(2)    If your answer to Question (d) (1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed: **The 19th Judicial Circuit Court, in and for St. Lucie County, Florida, P.O. Box 700, Ft. Pierce, FL 34954**

Docket or case number (if you know): **562002-CF-1166A**

Date of the court's decision: **June 16, 2015 and July 14, 2015**

Result (attach a copy of the court's opinion or order, if available): **See Appendix 4.**

(3)    Did you receive a hearing on your motion or petition?

Yes ☐                    No ☒

(4)    Did you appeal from the denial of your motion or petition?

Yes ☐                    No ☒

(5)    If your answer to Question (d) (4) is "Yes," did you raise this issue in the appeal?

Yes ☐                    No ☐

(6)    If your answer to Question (d) (4) is "Yes," state:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know): **N/A**

Date of the court's decision: **N/A**

Result (attach a copy of the court's opinion or order, if available): **N/A**

(7)    If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue:

**I was prohibited from using that court *pro se*. (See Appendix 7). I could not afford to pay an attorney $20,000 to do the appeal. (See Appendix 9).**

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on **Ground Nine: I first raised the issue on December 20, 2007. However, the trial court on January 9, 2008 dismissed the motion because I was represented by post conviction counsel. I was represented by counsel throughout the post conviction proceedin which was concluded on July 29, 2011 in Case No: 4D08-3124. Thereafter, I filed the claim pro se on August 2, 2011, refiled on November 21, 2012 and refiled on March 20, 2013.**

**GROUND TEN:** **Newly Discovered Evidence reveals that the State had actually destroyed the actual physical evidence, the aborted fetus, on May 21, 2002 and failed to disclose the destruction of the evidence to the defense in pre-trial proceedings, at trial, and during collateral proceedings, denying the Movant a fair and impartial trial in violation pursuant to the 5th, 6th, 8th, and 14th Amendment rights under the United States and Florida Constitutions which warrants dismissal of all charges and/or a new trial.**
(a)      Supporting facts: The State court unreasonably applied clearly established Federal law by rejecting Petitioner's claim of newly discovered evidence  without first conducting an evidentiary hearing and/or refuting the claim. When Petitioner stated to wit:

**Notice: For clarification Petitioner attached the exhibits of this Ground as Appendix 13.**

        On September 8, 2014 Movant received newly discovered evidence showing that evidence collected on May 21, 2002 was not the actual physical aborted fetus but was fluid from the victim's body, "amniotic sac fluid, and tissues of the expulsion of the alleged child victim's placenta,". See Exhibit 1. This motion is appropriate vehicle to challenge the State's bad faith destruction of the evidence prior to any paternity DNA testing conducted. *Moore v. State*, 903 So.2d 238 (Fla. 2nd DCA 2005); *Illinois v. Fisher*, 124 S.Ct. 1200 (2004); and *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); Fla.R.Crim.P. 3.850. an evidentiary hearing is required forthwith. *Hampton v. State*, 924 So.2d 34 (Fla. 3rd DCA 2006) where the State had destroy the living fetus on May 21, 2002 and failed to collect the actual physical aborted fetus.
        The standard of review for newly discovered evidence is established by Florida Supreme Court in *Jones v. State*, 591 So.2d 911 (Fla. 1991). Two requirements must be met in order to set aside a conviction or sentence because of newly discovered evidence. First, the asserted facts must been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that Defendant or his counsel could not have known them by the use of due diligence. Second, the newly discovered evidence must be of such a nature that it would *probably* produce an acquittal at retrial. *Jones v. State*, 709 So.2d 512, at 521-522 (Fla.), cert. den., 523 U.S. 1040 118 S.Ct. 1350, 140 L.Ed.2d 499 (1998). *Moore v. State*, 903 So.2d 238 (Fla. 2nd DCA 2005).

**First Requirement: under *Jones* 1, 2, and 3; *Swafford v. State*, 125 So.3d 760 (Fla. 2013). The evidence must not have been known by the trial court, the party, on counsel at the time of trial and it must appear that the defendant or defense counsel could not have known of it by the use of diligence.**

        C1      The Honorable trial court judge Dwight L. Geiger. Judge Geiger had no knowledge that the State had not collected that actual physical products of conception on May 21, 2002, for paternity DNA testing, when on June 13, 2002, the prosecuting attorney Ms. Kathryn M. Nelson, in open court told judge Geiger:[21]

───────────

[21] The State was not being candid with the Court; destroyed evidence favorable to the Defendant, thereby violating Defendant's due process rights. *State v. Herrera*, 866 So.2d 131 (Fla. 4th DCA 2004).

"the victim in this case became pregnant, and uh, the pregnancy was subsequent terminated. The products of the termination of the pregnancy were sent to the crime laboratory and the state is asking that the defendant be compelled to give a blood sample, uh, so that DNA comparison can be made between, uh, 'the products of conception' that are at the crime laboratory and the defendant's blood. And I've attached to our motion, uh, a copy of the arrest affidavit as well as a copy of the receipt from, uh, from the crime laboratory showing that those items are in fact at the lab." See, Exhibit 12, pp. 2-3.

C2       For some reason, judge Geiger, pre-trial counsel, trial counsel and Mr. Khan thought that the chain of custody was broken, and the State did collected the aborted fetus, products of conception, on May 24, 2002 through Officer J. Harkins from the Port St. Lucie Police Department, by some means unknown, as the prosecutor's husband testified to at trial and at pretrial (T.T. 487-493 and 525) deposition conducted on September 11, 2002. See, Exhibit 2.

C3       At trial, Mr. Ritzline, the prosecuting attorney Ms. Kathryn M. Nelson's husband, testified under oath that he received the products of conception – fetus – into his laboratory on May 24, 2002. T.T. 487-88. [22]

C4       Mr. Khan himself had no knowledge in pretrial or during trial that the actual physical evidence collected from the abortion center was only amniotic sac fluid and tissues from the placenta fluid material and not the actual aborted fetus, the products of conception, until he received the actual photo copy of the photographs sent to him on September 8, 2014 by the Indian River Crime Lab, in Exhibit 1.

C5       Mr. Khan was told that the aborted fetus was actually destroyed after the Indian River Crime Lab conducted the paternity DNA testing using the aborted fetus – due to a freezer stopping working at the laboratory. T.T. 672-676.

C6       Pre-trial counsel Ms. Tufte, in good faith did believe the DNA expert during his deposition conducted on September 11, 2002, that he actually received the aborted fetus and conducted a paternity DNA testing on the actual physical aborted fetus, that he cut off the aborted fetus' foot and tested it for paternity DNA testing. See Exhibit 2.

C7       Pre-trial counsel Mr. Goodman was told by the prosecutor, Ms. Kathryn M. Nelson, in open court before judge Geiger that the laboratory had received the products of conception and was waiting for Mr. Khan's blood samples so that the DNA expert could do his comparison. See Exhibit 12, pp. 2-3.

C8       Trial counsel[23] in good faith believed that the DNA expert was telling the truth under oath in open court that he conducted a paternity DNA testing using the products of conception, the aborted fetus. See Exhibits 11, also T.T. 487-530. Trial counsel believed the State's witness Nadine Khan's testimony that the Detective talked to her about getting the fetus from the abortion center. T.T. 321:4-6. Therefore, trial counsel had no reason to disbelieve the State's evidence at trial as counsel testified to the Florida Bar. See, Exhibit 11.

**Second Requirement under _Jones_ I, II, III, and _Swafford_, supra. The newly discovered evidence must be of such a nature that it would probably produce an acquittal on retrial.**

C9       At a retrial, the State would not be able to present any paternity DNA testing to the jury or the Court regarding Count Three and the nature of the newly discovered evidence would probably produce an acquittal on Counts Three. Mr. Khan would receive a less severe sentence. _Jones_, 591 So.2d 911, 915 (Fla. 1991); _Swafford v. State_, 125 So.3d 760 (Fla. 2013).

---

[22] _T.M.H. v. T.M.T._, 79 So.3d 806 (Fla. 5th DCA 2011) provides the definition of "Products of Conception," it is not fluid, it is the actual fetus. _Ob/Gyn v. Ana Mejia and Rodolfo-Santana_, 39 Fla.L.Weekly D110 (Fla. 4th DCA January 8, 2014). Also see Exhibit 10 and 19 which show a photograph of a fetus. See Exhibit 10 and 19.

[23] Trial counsel believed in the DNA report which stated it was the "products of conception." See Exhibit 4, _Waterhouse v. State_, 37 Fla.L.Weekly S.112 (Fla. SC12-107 2-8-12); also see Exhibit 11.

C10     Without the paternity DNA testing, the State would not be able to inform the jury or the Court about evidence of an abortion, (that the child victim had an abortion in opening during trial and final closing arguments to the jury), evidence that Mr. Khan is the father of his dauther's baby, Count Three.

C11     At retrial, there is a reasonable probability, with the omitted paternity DNA testing, the State would not be able to attempt to prove Counts One and Two, the all essential element, for Count One, "penetration" or Count Two, "penetration" and would probably produce an acquittal on retrial on Count One and Two due to the fact the DNA testing was used to convince the jury that there was penetration which caused the impregnation of the minor child.

**Therefore, Mr. Khan meets the second requirement under *Jones* I, II and III.**

C12     Destruction of the actual physical aborted fetus required dismissal of all charged and/or Counts Three and a new trial is warranted on Counts One and Two. In *Bennett v. State*, 23 So.3d 782 (Fla. 2nd DCA 2009) that court set out two requirements for a court to consider. One: the lost opportunity to present relevant evidence which involved evidence that would have created a reasonable probability that the outcome of the proceeding would have been different. Two: the Defendant did not have an adequate alternative method to provide comparable evidence.

C13     First: Mr. Khan will prove the first requirement under *Bennett*. The loss/destruction of evidence denies Mr. Khan the legal right to have paternity DNA testing performed utilizing the newer and more advanced DNA testing known as MiniSTR, which is more sensitive to the Y-STR. This would have been conducted by an outside laboratory, DNA Diagnostics Center, at Forensic Services in and for one DOC Way, Fairfield, OH 45014. DNA Diagnostics Center is willing and ready to perform paternity DNA testing on the aborted fetus.

C14     As shown in Exhibit 9, pursuant to Fla.R.Crim.P. 3.853, Section 925.11, Fla. Stat. (2014), similar to the case of *Cardona v. State*, 109 So.3d 241 (Fla. 4th DCA 2013), which would have shown that Mr. Khan is in fact the biological grandfather of the aborted fetus, and not the father of the aborted fetus. The newer and more advanced testing would also show that the aborted fetus had no anomaly within the DNA, such DNA testing and would have exonerated Mr. Khan from being the biological father of the aborted fetus where the State failed to collect the aborted fetus and conducted a paternity DNA testing on the aborted fetus.

C15     The destruction of the aborted fetus denied Mr. Khan the opportunity to present a qualified obstetrician to estimate the age of the aborted fetus. Which is possible by analyzing the size of the aborted fetus, the actual physical aborted fetus that was aborted on May 21, 2002 as explained in Exhibit 8. Such examination of the aborted fetus would have provided Mr. Khan with the approximate age of the actual physical aborted fetus. See, Exhibit 8. (This was not presented at trial). Such examination of the aborted fetus would have shown evidence that the conception of the aborted fetus was not in the United States, but instead in Trinidad and Tobago by the victim's boyfriend, Jonathan.[24] This would have provided Mr. Khan with newly discovered evidence and would have caused Mr. Khan to file a motion for post-conviction relief pursuant to Fla.R.Crim.P. 3.850(b)(1), (2014) that could have created a reasonable probability with such new finding the outcome of the proceeding would have been different because the Court would have to exclude the DNA evidence, because it would have lacked subject matter jurisdiction over the conception of the aborted fetus where the alleged child victim came into the State of Florida on December 17, 2001 already pregnant with her boyfriend Jonathan's child. See, Exhibit 20.

C16     Second: Mr. Khan will now prove the second requirement under *Bennett*. In pre-trial, Mr. Khan requested a second paternity DNA testing by his defense. See, Exhibit 3, pp. 16-17, also see Exhibit 5 and at sentencing, T.T. 672-676.

---

[24] Even Nakita Khan's handwritten claim that the fetus was five months and three weeks old. See Exhibit 21.

C17     On January 4, 2005, Mr. Khan filed a motion to have the aborted fetus preserved for paternity DNA testing due to his knowledge that he did not have sexual intercourse with his biological daughter in order to father her child, the aborted fetus, and that he was in fact innocent of the allegations. Mr. Khan was in fact inquiring over years regarding paternity DNA testing seeking new paternity DNA testing by an independent crime laboratory. See Exhibit 8, 9 and 15.

C18     Therefore, the loss or destruction of the aborted fetus denies Mr. Khan an adequate alternative method to provide comparable evidence that he is innocent of fathering his biological daughter's baby, the aborted fetus by utilizing the new, more sensitive testing MiniSTR which is utilized by DNA Diagnostics Center, who is willing and able to perform such testing for Mr. Khan. See Exhibit 9. Additionally, Mr. Khan would utilize a qualified obstetrician to estimate the age of the actual physical aborted fetus, which would have shown evidence of conception proving innocence.

## ARGUMENT ON THE MERITS

C19     Mr. Khan asserts that the State failed to receive the actual physical aborted fetus on May 21, 2002. What Mr. Dennis received from the abortion center was "amniotic sac fluid, and tissues of the expulsion of the alleged child victim's placenta," T.T. 458-459, as Mr. John Halmon testified to, T.T. 350:22-25 as shown in Exhibit 1, pp. 3-4.

C20     The amniotic sac fluid and/or placenta was not the products of conception, but was the Defendant's biological daughter's "amniotic sac fluid, and tissues of the expulsion of the alleged child victim's placenta." The placenta's purpose is to connect the mother and fetus via an umbilical chord. The placenta transfers nutrients and oxygen to the developing fetus. See Exhibit 16. The facts are well settled that the amniotic sac fluid and the placenta are not products of conception and Mr. Ritzline claimed someone told him it was the aborted fetus, products of conception. T.T. 525:16-25. In fact, when Mr. Ritzline received the fluid material on May 24, 2002, it was frozen, still on ice. T.T. 487. The material was "ice," not a fetus or products of conception. Exhibit 10 shows a developing fetus inside its mother; Exhibit 1 does not reveal such within the photograph. Also see Exhibit 19.

C21     Mr. Khan pled not guilty to the charge of sexual battery. On May 21, 2002 the State conducted an illegal abortion without using the process of the court and collected the alleged child victim's "amniotic sac fluid, and tissues of the expulsion of the alleged child victim's placenta" for DNA testing.

C22     [25]Mr. Khan argues that the State tampered with the living fetus that was 5 months and 3 weeks old by killing the fetus, see Exhibit 20; through the illegal abortion and failed to collect the aborted fetus, "products of conception," for paternity DNA testing and the State prosecutor lied to the trial court on June 13, 2002 claiming that the Indian River Crime Laboratory had the products of conception. See, Exhibit 12, pp. 2-3. For the foregoing reason(s), Judge Geiger granted the State's motion compelling Mr. Khan to submit his blood sample for withdrawal in order for a DNA comparison to be made between the products of conception and the Defendant's blood. Exhibit 12, pp. 2-3. The prosecutor lied to her husband, Mr. Ritzline, by telling him that the amniotic sac fluid and placental tissues were in fact the products of conception. T.T. 525:16-25.

---

[25] In *Re Guardianship of J.D.S. v. Wixtrom*, 864 So.2d 534 (Fla. 5th DCA 2004), the Court, Judge Pleaus stated in his dissenting opinion:

" ... My concern with the ramifications of the majority opinion compels me to write the following. I have a new grandson, Nicholas. His heart started beating a short time after conception and during that first trimester, or early in the second trimester, we were able to view a sonogram and determine that Nicholas was a boy. We have pictures of sonograms taken when Nicholas was only fourteen weeks old. You can see his head, his eyes, his arms and legs. He was so strong you could watch him move under his mother's pregnant belly. Before he was born, his parents placed a sign over his future crib. It read simply: "Nicholas." Nicholas now lives outside his mother's womb, but from the moment of his conception, Nicholas was a human life." ...

C23     In fact the State induced the alleged child victim's mother, Nadine Khan to agree before the jury that whether the Detective talked to her about getting the fetus from that abortion and taking it (T.T. 321:4-6) which was not true, the evidence received was not the aborted fetus but was "amniotic sac fluid, and tissues of the expulsion of the alleged child victim's placenta," T.T. 350:22-25.

C24     In *U.S. v. Natson*, 469 F.Supp.2d 1253 (M.D. GA 2007), the DNA expert received the dead fetus' bones and could not say with a degree of certainty that the Defendant was the father of the fetus.

C25     In the instant case, the State did not collect the actual physical aborted fetus. T.T. 455, Exhibit 1, pp. 3-4; and Exhibit 11. The State collected the alleged child victim's "amniotic sac fluid, and tissues of the expulsion of the alleged child victim's placenta," T.T. 350:20-25, see Exhibit 1. As shown in Exhibit 16, the fetus, products of conception is not the victim's amniotic sac fluid or placenta and therefore, the State knowingly lied to the trial court on June 13, 2002 telling the court that the Indian River Crime Lab had the products of conception. Exhibit 12, pp. 2-3. The State filed false charges on August 8, 2002: child abuse, impregnating a minor Count Three and did present false testimony at trial claiming that the DNA material received was the aborted fetus – products of conception T.T. 454. This denied Mr. Khan a fair and impartial trial, the mention of the evidence to the jury as an aborted fetus products of conception was prejudicial to the Defendant and confused and mislead the jury. Therefore, this Court should deem the DNA evidence to be inadmissible and withdraw its judgment and sentence granting a new trial without the DNA evidence. *Stephenson v. State*, 31 So.3d 847 (Fla. 3rd DCA 2010).

C26     Mr. Khan further argues that he is being illegally detained due to the destruction of the aborted fetus, products of conception, on May 21, 2002 where the State charged him and convicted him of the crime of impregnating a minor and did not test the aborted fetus. The destruction of the products of conception denied Mr. Khan the legal opportunity to have a DNA test conducted using the actual physical aborted fetus, products of conception through Fla.R.Crim.P. 3.853 2001-2015 and section 925.11, Fla. Stat. which was adopted in 2001 that extended convicted criminal defendant's the substantive right to obtain DNA testing in order to challenge their conviction or sentence. Thus, the disposition of evidence on May 21, 2002 deprived Mr. Khan the process of the State's law. rule 3.853, Fla.R.Crim.P. and section 925.11 Fla. Stat. (2001).

C27     Mr. Khan's argument is regarding the destruction of evidence prior to any paternity DNA testing conducted on the aborted fetus. *Youngblood*, 488 U.S. 51, (1988); *Illinois v. Fischer*, 540 U.S. 544, 546-47, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004); *Ferguson v. Roper*, 400 F.3d 635 (8th Cir. 2005); *Custadio v. Fisher*, 2007 WL 2819313 at 4N. (D. Idaho 2007) aff'd 331 F.Appx. 513 (9th Cir. 2009) aff'd 331 F.Appx. 513 (9th Cir. 2009); *Swoopes v. Ryan*, no. CV-93-471, 2011 WL 2976887 at 12 (D. Ariz July 22, 2011).

C28     Mr. Khan argues that the State destroyed the living fetus in bad faith because the State failed to use the process of the court prior to ordering the abortion on May 21, 2002 outside of the court's jurisdiction, knowing the fetus was not destroyed and born alive, the baby would have shown that it was conceived in Trinidad and Tobago and not in the State of Florida. Mr. Khan would have sought a paternity DNA testing pursuant to Fla.R.Crim.P. 3.853 and pursuant to section 925.11, Fla. Stat. (2001-2014) which would have excluded him as being the father of the aborted fetus. See Exhibit 20.

C29     Due to the State's action, Mr. Khan was deprived of his substantive rights which were created in 2001, Fla.R.Crim.P. 3.853 and section 925.11 Fla. Stat. the legal right to have a DNA test conducted on the aborted fetus. Also see *Cardona v. State*, 109 So.3d 241 (Fla. 4th DCA 2013). Had the State not destroyed the living fetus, the DNA testing would have proven Mr. Khan's innocence in Count Three. Mr. Khan would have received a lesser sentence and Mr. Khan was prejudiced by the destruction of the fetus, his grandchild, his daughter's baby.

C30     Mr. Khan adopts Grounds One and Two within Ground Three and asks that this Court discharge him from his detention itself and/or grant a new trial because without the State's DNA expert testimony, there is a reasonable probability that the outcome would have been different at trial and/or on appeal, because the trial court denied the judgment of acquittal based on the DNA testimony (T.T. 611) and the appellate court per curiam affirmed Mr. Khan's conviction on appeal claiming the DNA evidence was "overwhelming evidence of guilt." See Exhibit 18. The destruction of evidence was material evidence to the Defendant and did prejudice the Defendant and denied the Defendant of due process of law.

C31     Therefore, Mr. Khan has met the second requirement under *Bennett*. The State is now required to show cause. The State holds the burden to prove that the Defendant had not been prejudiced by the destruction of the aborted fetus. If the State cannot show such, then dismissal on Count Three is warranted and a new trial on Counts One and Two is warranted as a matter of law.

(b)     If you did not exhaust your state remedies on **Ground Ten**, explain why:

**I was sanctioned by the appellate court and could not file any pro se appeals. (See Appendix 7) and I could not pay $20,000.00 for an attorney's representation. See Appendix 9.**

(c)     **Direct appeal of Ground Ten:**

(1)     If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐               No ☒

(2)     If you did <u>not</u> raise this issue in your direct appeal, explain why: **I was represented by an attorney who failed to investigate and discover the issue. Had the issue been presented to the Fourth DCA, the judge panel would not have considered the DNA evidence as overwhelming evidence of guilt. (See Appendix 8).**

(d)     **Post-Conviction Proceedings:**

(1)     Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ☒               No ☐

(2)     If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed: **The 19th Judicial Circuit Court, in and for St. Lucie County, Florida, P.O. Box 700, Ft. Pierce, FL 34954**

Docket or case number (if you know): **562002-CF-1166A**

Date of the court's decision: **June 16, 2015 and July 14, 2015**

Result (attach a copy of the court's opinion or order, if available): **(See Appendix 4).**

(3)     Did you receive a hearing on your motion or petition?

Yes ☐               No ☒

(4)     Did you appeal from the denial of your motion or petition?

Yes ☐               No ☒

(5)     If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐               No ☐

(6)     If your answer to Question (d)(4) is "Yes," state: **N/A**

Name and location of the court where the motion or petition was filed: **N/A**

Docket or case number (if you know): **N/A**

Date of the court's decision: **N/A**

Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (d) (4) or Question (d) (5) is "No," explain why you did not raise this issue:
**I was sanctioned and prohibited from using that court *pro se* (See Appendix 7) and could not afford an attorney to represent me. See Appendix 9.**

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Ten: **I first raised the issue on December 20, 2007 but the trial court on January 9, 2008 dismissed the motion/issue because I was represented by post conviction counsel which was concluded on July 29, 2011 in Case No: 4D08-3124.**

13.   Please answer these additional questions about the petition you are filing:
   (a)  Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?                                              Yes ☐                 No ☒
        If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them:
        **Grounds 6, 8, 9 and 10 was not appealed to the Fourth DCA due to the fact the Fourth DCA sanctioned and prohibited the Petitioner by entering an order of Prohibition from using that court as pro se litigant in case number 4D14-2143 in his eleventh petition. See Appendix 7.**
        **Therefore, I could not seek further review in Florida courts. It is stated that a Federal court will accept such pleading when the Petitioner has no other judicial remedy within the State court. The claims within Grounds 6, 8, 9 and 10 are Actually Factually Sufficient claims showing the Petitioner is actually  factually innocent of the crimes charged and convicted of.**
   (b)  Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:
        **N/A**

14.  Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?                       Yes ☐                 No ☒
        If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available:
        **N/A**

15.  Do you have any petition or appeal <u>now pending</u> (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?                      Yes ☐                 No ☒
        If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised: **N/A**

16.  Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:
        (a) At preliminary hearing: **Fran O. Ross, Esq, Fla. Bar No. 0747785. 320 Ave A Fort Pierce, FL 34950 (777) 465-5240; Jeffrey Goldman, Fla. Bar No. 102393, Assistant Public Defender, 216 South Second Street, Ft. Pierce, FL 34950 (561) 462-2048.**
        (b) At arraignment and plea: **Karen J. Tufte, Fla. Bar. No.: 0998151, 212 South 7th Street, Ft. Pierce, FL 34950 (772) 489-9096.**
        (c) At trial: **Mr. Edward Abare, Fla. Bar No: 874590 and Patrick McCrae, Fla. Bar No.: 0565725, both from St. Lucie County, Florida, Public Defender's office, court appointed counsel, 216 S. Second Street, Ft, Pierce Fla 34950 (772) 462-2048.**

        (d) At sentencing: **Mr. Edward Abare, Fla. Bar No: 874590 and Patrick McCrae, Fla. Bar No.: 0565725, both from St. Lucie County, Florida, Public Defender's office, court appointed counsel, 216 S. Second Street, Ft, Pierce Fla 34950  (772) 462-2048.**

(e) On appeal: **Eric M. Cohen, Fla. Bar. No.: 238065, 9130 South Dadeland Blvd, Miami, 33156, (305) 670-0230**

(f) In any post-conviction proceeding: **Nicole P. Menz, Fla. Bar 0041092, 662 Azalea Lane, Vero Beach, FL 32963 (772) 234-8025**

(g) On appeal from any ruling against you in a post-conviction proceeding: **Christine C. Geraghty Office of the Public Defender, 421 3rd Street, West Palm Beach FL 33401-4297 (561) 355-7500.**

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?          Yes ☐          No ☒

    (a) If so, give name and location of court that imposed the other sentence you will serve in the future: **N/A**

    (b) Give the date the other sentence was imposed:  **N/A**

    (c) Give the length of the other sentence:  **N/A**

    (d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?          Yes ☐          No ☒

18.    TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. §2244 (d) does not bar your petition.

**Petitioner's judgment was final on October 22, 2004 when he received the mandate in case no. *Khan v. State*, 884 So.2d 946 (Fla. 4th DCA 2004). Petitioner filed a motion to correct illegal sentence on May 16, 2005 and the mandate was issued on October 12, 2005 in case no. 4D05-2422. Petitioner filed a second motion to correct an illegal sentence on October 12, 2005 which was denied on April 3, 2006. No appeal was taken. On May 31, 2006, Petitioner filed a motion for post-conviction relief which mandate was issued on July 29, 2011 in case no. 4D08-3124. On August 2, 2011, Petitioner filed a second motion on the claim of newly discovered evidence which was amended twice and denied on June 16, 2015. Petitioner filed a third motion on the claim of newly discovered evidence on February 19, 2015 which was denied on June 16, 2015. A timely Notice of Appeal was filed on July 14, 2015 which the trial court denied as a final orderd granting the Petitioner thirty days to appeal. No appeal was taken because the Fourth District Court of Appeal entered an order prohibiting the Petitioner from using the appellate court's jurisdiction in case number 4D14-2143. (See Appendix 7). The Petitioner could not pay an attorney $20,000 to do the appeal. (See Appendix 9).**

**Therefore, this writ is within the one year time limitation period set forth in 28 U.S.C. 2254.**

---

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. §2244 (d) provides in part that:

    (1)    A one-year period of limitation shall apply to an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –

        (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

        (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

        (C)    the date on which the constitutional right asserted was initially recognized by Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review, or

        (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through

        the exercise of due diligence.

    (2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under the this subsection.

Therefore, petitioner asks that the Court grant the following relief:  **Consider this petition as a whole under the actually factually innocence standard, granting the Petitioner an evidentiary hearing with the appointment of counsel to fully litigate the claims within and/or a new trial based on the numerous grounds cited herein.**

/s/

Roger Khan #K62116
Petitioner

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that his Petition for Writ of Habeas Corpus, was placed in the prison mailing system on _____ (month, date, year).
Executed (signed) on _*August 11, 2015*_____ (date)

/s/

Roger Khan #K62116
Martin Correctional Institution
1150 S.W. Allapattah Road
Indiantown, Florida 34956

REC'D AUG 1 1 2015

/s/ *From*

Roger Khan, # K62116
Martin Correctional Institution
1150 S.W. Allapattah Road
Indiantown, Florida 34956

To;      Southern District.
         FEDERAL Court OF Florida
         400 N. MIAMI AVENUE
         MIAMI Fla. 33128

